*17-0546-cv*
*Kevin Flood, et al. v. Just Energy Marketing Group, et al.*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term, 2017

(Argued: February 20, 2018     Decided: September 19, 2018)

Docket No. 17-0546-cv

KEVIN FLOOD, individually and on behalf of all others similarly situated, ABIGAIL WILTZ, YALONTYA SIMMONS, WILLIAM PROCTOR, VICTOR GREEN, AKIL MATAS, ANDREW GUGINO, ANDREW WILLIAMS, BERNARD BECKER, BRENDAN O'MALLEY, CHEDELINE DECIUS, CHERYL ROOT, CHRISTOPHER STRINGHAM, AESHA JOHNSON, ALIBIN DRAYTON, CONRAD CAMPBELL, BRYAN POPPENGER, DARYL POST, DAVID SAROFF, MICHAEL A. JOHNSON, CHRISTINE BURNS, DONETTE KINGSTON, DWIGHT FORBES, FANTASIA CLARK, CHUNSEY BRAMLETT, FLOYD MAYO, HEIDI MINER, HOWARD HEARD, JR., JACOB OYEBAMIJI, JAMES BAKER, III, JAMES FRALIX, JASON DARDEN, JASON RUSSELL, JAYMIE CARPENTER, JEAN PHANOR, JERMAIN ALBERGA, JORDAN MITCHELL, JOSEPH DANIAL, JOSEPH BOBB, JR., JOSEPH FIATO, JUSTIN NUNEZ, KARIN CALHOUN, KENNETH HOFFMAN, LUKE BIGGINS, MARI-LOUISE MERKWA, MARY JO CARROLL, MICHAEL SLISH, MILANDRO GENCIANA, NATHAN ADAMS, NEIL TELESFORD, NICHOLAS BARBATO, OMAR NIASSE, PRINTA DORROUGH, ROBERT DEPROSPERO, ROXANNE KNOX, RUNEY MAH, RYAN MCMANUS, SASIYA DAVIS, SHANE MENNIG, SUE PROM, TAMARAH TEAGUE, TAVARAS RICHARDSON, THERESA BREX, TOCHUKWU EZEAGWUNA, TOMMY HAYWOOD, COREY BREWER, EDWIN M. RIVERA, JR., HUSEIN ROBINSON, JENERY GONZALEZ, TYSTFYR BUTLER, ADRIAN MAPP, AKILAH CHANDER,

1

ALBERTINA WINSTEAD, ANTHONY THOMPSON, BERNARD ULEANO, BRIAN MAHON, BRYAN K. SMITH, JR., CARLOS DE LOS SANTOS, CARLOS HODGSON, CARRIE ANN KUST, CHAD SIMMONS, CHRISTINE JONES, DANAY WALKER, DANZALE ELSTON, DARYL GILLIAM, DAVID PRAGEL, DAVON BATES, DEMETRIE BROWN, DORCAS ROSA, GAIUS DIPIGNEY, GARRICK AVERA, GERARD JEFFERSON, GINA DIFILIPPI, GREGORY BRAINARD, GREGORY MATURANO, GREGORY MITCHELL, HORACE FRANCIS, JESSYCA BERROA, JOHNNY OLIVER, JONATHAN EBERLEIN, JONATHAN ROSS, JORDAN URBANSKI, KEITH MACDONALD, KENNETH JOHNSON, KHALID HAMIDEH, LA'TRICE T. PURDIE, MARCELL ECCLES, MARISOL TAVARES, MARTIN ENDERS, MATTHEW MORALES, MICHAEL PIERRE, MILTON FLOOD, NASIBA BAIMATOWA, NORMAN JOHNSON, OSKAR RODRIGUEZ, PATRICK RUDA, RAHEEM REDDICK, RAYMOND BROWN, ROCIO VELAZQUEZ, RUSSELL MARTINA, TERRANCE HARDY, TYMONT PATTON, WILLIAM PORTER, BRABIM HAMAL, BYRON RESPRESS, DARIUS FORREST, ELIZABETH MARIE TERRY, INGRID COTTERELL INGRAM, JARIEMELLE RIVERA, ALEX MOTHERSELL, ALEXANDER CAIELLO, BRANDON MEANS, DAYQUAN JOHNSON, JAION HYMAN, JENNIFER ZELASKI, ROBERTO FLORES, TRUDY NUNAN HOBAICHAN, VICTORIA GREEN, AHMAD AMIN, ASHLEY WOLFE, CORTEZ CROSS, CRYSTAL WHITE, DAQUAN FOSTER, DEMETRIUS HARVIN, DENISE LENNON, EMMANUELLA PIERRE-TOUSSAINT, JOHN KORNICHAK, JOHN MONAHAN, JUAN LOPEZ, KHALDWN EL-FARES, KRISHA PRUNIER, LISA CHIN, LUCINDA KAPTUR, MICHAEL KIRCHMYER, MONTE'WELL GODLEY, NATHANIEL BRAY, SHERMAN WALKER, STEPHEN MARCONI, TAMEA DIXON, TIENTCHEU LAMBERT, WAYLON STEWART, AHMAD DAVIS, CHANTALE DURAND, DILAN MICHAEL BOND, MARGARET OFIKWU, RONALD WILLIAM, DANTE GUTIERREZ, GARY SCHUELER, JOSHUA VINCENT, SCOTT WILLIAMS,

*Plaintiffs-Appellants*,

–v.–

2

JUST ENERGY MARKETING CORP., JUST ENERGY NEW YORK CORP., JUST ENERGY GROUP INC.,

*Defendants-Appellees.*

———————

Before:

KEARSE, LIVINGSTON, *Circuit Judges*, and MEYER, *District Judge.*[*]

Plaintiff-appellant Kevin Flood, on behalf of himself and those similarly situated to him, appeals from a judgment of the United States District Court for the Southern District of New York (Forrest, *J.*), granting summary judgment to defendants-appellees Just Energy Marketing Corp., Just Energy New York Corp., and Just Energy Group, Inc. ("Just Energy") on plaintiff's minimum wage and overtime claims brought under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and New York Labor Law ("NYLL") §§ 650 *et seq.* In its ruling granting Just Energy's motion for summary judgment, the district court concluded that plaintiff was exempt as an "outside salesman" under the FLSA and NYLL. Applying *de novo* review and viewing the facts in the light most favorable to plaintiffs, we agree that there is no genuine issue of fact to dispute that plaintiffs were outside salesmen—that is, to dispute that they were regularly employed away from Just Energy's office and that their primary duty was to make sales as well as to obtain orders or contracts for services. In so concluding, we reject plaintiffs' argument that the outside salesman exemption may not be applied because of the fact that Just Energy retained discretion to reject commitment contracts that plaintiffs secured from their door-to-door customers. We also reject plaintiffs' argument that the outside salesman exemption may not be applied because of the overall degree of supervision that Just Energy exercised over plaintiffs' activities. In addition, we conclude that the district court did not err or abuse its discretion when it declined to find that Just Energy should be collaterally estopped from invoking the outside salesman exemption in this case.

AFFIRMED.

———————

[*] Judge Jeffrey Alker Meyer, of the United States District Court for the District of Connecticut, sitting by designation.

NICOLE T. FIORELLI, Dworken & Bernstein Co., L.P.A., Painesville, Ohio (Patrick J. Perotti and Frank A. Bartela, Dworken & Bernstein Co., L.P.A., Painesville, Ohio, and Catherine E. Anderson, Giskan Solotaroff & Anderson, LLP, New York, New York, on the brief), *for Plaintiffs-Appellants*.

BRADLEY A. SHERMAN, Sherman Boseman Legal Group, Cleveland, Ohio (Shannon K. Littler Mendelson, P.C., Cleveland, Ohio, and Ivan R. Novich, Littler Mendelson, P.C., Newark, New Jersey, *on the brief*), *for Defendants-Appellees.*

JEFFREY ALKER MEYER, *District Judge*:

This appeal principally calls on us to examine the scope of the "outside salesman" exemption to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and New York Labor Law ("NYLL") §§ 650 *et seq*. An outside salesman is an employee who regularly works away from the employer's business and whose primary job duty is to make sales or to obtain orders or contracts for services.

Plaintiff Kevin Flood and similarly situated employees worked for a group of affiliated energy supply companies who are collectively referred to here as "Just Energy." Flood and his co-plaintiffs were employed to engage in door-to-

4

door solicitation to persuade customers to buy their electricity or natural gas from Just Energy.

Plaintiffs claim that Just Energy failed to pay them minimum wage and overtime pay as required under the FLSA and NYLL. Just Energy responds that it had no obligation to do so because of the outside salesman exemption under the FLSA and NYLL. The district court (Katherine B. Forrest, J.) granted summary judgment in favor of Just Energy.

We agree with the district court that there are no genuine issues of fact to call into question that plaintiffs were outside salesmen within the meaning of the FLSA and NYLL. Even viewing the facts in the light most favorable to plaintiffs, we agree that plaintiffs were regularly employed away from Just Energy's office and that their primary duty was both to make sales as well as to obtain orders or contracts for services. In so concluding, we reject plaintiffs' argument that the outside salesman exemption may not be applied because of the fact that Just Energy retained discretion to reject commitment contracts that plaintiffs secured from their door-to-door customers. We also reject plaintiffs' argument that the outside salesman exemption may not be applied because of the overall degree of supervision that Just Energy exercised over plaintiffs' activities. In addition, we

5

conclude that the district court did not abuse its discretion when it declined to find that Just Energy should be collaterally estopped from invoking the outside salesman exemption. Accordingly, we affirm the judgment of the district court.

## BACKGROUND

Flood worked for Just Energy for more than three years from September 2011 to November 2014.[1] In September 2011, he signed an agreement that described his responsibilities to include "door to door solicitation services" in order "to assist [Just Energy Marketing Corp.] in obtaining Contracts for the benefit of [Just Energy New York Corp.]."[2] J.A. 2267. The agreement further stated that Flood would be "engaged in the business of selling (or soliciting the sale of) consumer products (natural gas and electricity) otherwise than in a permanent retail establishment," and that his compensation "for the performance of the direct selling services is directly related to the sales or other output

---

[1] We follow the district court's ruling in setting forth facts here that relate to Flood and not to the other more than 100 plaintiffs who have joined in this action. After the district court entered summary judgment against Flood, it granted summary judgment as well against the remaining plaintiffs after they declined the district court's invitation to set forth any distinguishing facts for purposes of their own claims. S.A. 19.

[2] Although the agreement he signed characterized him as an independent contractor, the parties do not dispute for present purposes that Flood was an employee within the meaning of the FLSA and NYLL. *See Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 534 (2d Cir. 2016) (noting that "[t]he strictures of both the FLSA and NYLL apply only to employees").

(including the performance of services) rather than to the number of hours worked." J.A. 2268.

Flood spent about 75-80% of his time with Just Energy making door-to-door solicitations, mostly with residential customers. On a typical work day, Flood arrived at one of Just Energy's regional offices sometime between 9:30 a.m. and 10:00 a.m. for a morning meeting that lasted about one hour. These meetings covered topics such as updates on products, awards, regulatory or market information, and sales practices. By around 12:30 p.m., a company employee used a van to transport Flood and his colleagues to different neighborhoods where they then dispersed to knock on doors to solicit business for Just Energy.

When engaged in door-to-door solicitation efforts, Flood wore a company badge and followed a company script. He told the customer at the outset that he worked for Just Energy and did not represent the customer's utility company. He then explained to the customer that he was there to make sure that the customer had his or her energy supply program up to date and was not being overcharged by the utility company. Flood explained about how energy rates fluctuate, about how customers have a choice from whom to buy their energy, and how Just

Energy could supply the customer's energy needs at favorable and predictable rates.

Flood also handed out a Just Energy brochure as a "visual," J.A. 120 (¶ 41), and he used a graph on an iPad as what he called a "sales tool," J.A. 300-02, to illustrate to a customer the volatility of energy prices. He asked every customer to retrieve a utility bill so that he could verify that the person he was speaking to was responsible for making decisions regarding the household energy supply and that the customer was eligible to change energy suppliers.

If the customer was convinced by Flood's pitch, then the customer filled out a service agreement setting forth the essential terms of service from Just Energy, including the rate, late fee provision, and early cancellation provision. Flood then remained nearby but outside of the customer's immediate presence while the customer was required to complete a third-party verification call. The purpose of this verification call was to prevent fraud and to ensure that the customer understood what he or she was purchasing. The third-party was not a Just Energy employee and asked yes-or-no questions limited to ensuring that the customer understood the terms of the agreement. If the verifier was satisfied by

the customer's answers, then the verifier gave a confirmation number to the customer who in turn gave it to Flood to put on to the customer's agreement.

Just Energy's training materials describe this moment at the conclusion of the third-party verification call as "a critical point of the sale." J.A. 2493. "You want to confirm the program details (price, term, GEO*power* and GEO*gas*, cancellation policy) before you leave. Ensure the customer has no further questions and then hand over the paperwork with the agreement." *Id.* "Using the agreement you completed, close the sale by giving the customer all the paperwork." J.A. 2494.

Flood agreed at his deposition that he was "the last person to sell a customer" and that "no one comes in and sells after" him. J.A. 447.

Q.    So, really, the last salesperson to touch the customer is the
        doorknocker, is you?

A.    Me.

Q.    That's correct?

A.    Yes, sir.

J.A. 415.

Flood was also asked in this context if he viewed himself as a salesperson:

9

Q. If I were to tell you you were not a salesperson, you were not doing sales, would you agree with me?

A. No.

Q. Why not?

A. Because that's what I do.

*Id.* According to Flood, "for the 40 months I was there [working for Just Energy] I probably sold in excess of 8,000 accounts, all door to door." J.A. 163.

At the end of the day—sometimes as late as 8:00 or 9:00 p.m. —an employee with the company van returned Flood and his colleagues again to the regional office. Flood submitted signed copies of customer agreements to Just Energy's regional office, and the agreement was then forwarded to a corporate office in Canada for processing. The agreement was not deemed "effective" until it "(i) [was] properly completed, signed by the customer, approved by the applicable [Just Energy] Affiliate and approved by the local utility, and (ii) [became] effective in accordance with Applicable Law." J.A. 2268. An agreement could be rejected if the customer had poor credit or if the customer had a so-called "slam block" on the utility account that prevented the customer from switching to a different energy supplier. J.A. 381-83.

10

Flood was compensated on a 100% commission basis. He was not paid a salary or on an hourly basis but instead was paid by commission in accordance with the number of customers he contacted who were convinced to obtain their energy from Just Energy. Flood was also eligible to earn reconciliation and residual payments when customers retained Just Energy's services for more than a certain period of time. On the other hand, Flood was not compensated for contracts that were subsequently cancelled before one year of service or that never resulted in the provision of energy service.

According to Flood, he worked no less than 60 hours per week, sometimes six or seven days per week for 50 of the 52 weeks in a year. For the two full calendar years he worked for Just Energy in 2012 and 2013, he earned more than $70,000 in commissions per year, as well as incentive awards for travel to Hawaii and Europe, among other places.

Several months after he left Just Energy's employment, Flood filed this collective action in March 2015 alleging that Just Energy had failed to pay him wages and overtime as required under the FLSA and the NYLL.[3] After the

---

[3] Count One of the complaint alleges a violation of the FLSA for failure to pay minimum wage and overtime. Count Two of the complaint alleges a parallel violation of the NYLL. Count Three of the complaint alleges a violation of the NYLL for failure to pay wages for each hour worked and failure to pay wages weekly.

district court conditionally certified the collective action, Just Energy moved for summary judgment, while Flood in turn moved to certify the putative class pursuant to Fed. R. Civ. P. 23.

The district court granted Just Energy's motion for summary judgment, agreeing with Just Energy that Flood was an exempt outside salesman.

> It is clear that Flood was an outside salesperson: when he knocked on doors, he was responsible for culling potential customers from ineligible residents; he, and only he, attempted (often quite successfully) to sell them energy services; and the record indicates that, once the residents signed up for Just Energy's services, defendants did little other than make sure there were no technical or legal issues with processing the contracts. Accordingly, there is no genuine dispute that Flood's primary duty was "making sales."

*Flood v. Just Energy Marketing Corp.*, No. 15-cv-2012, 2017 WL 280820, at *5 (S.D.N.Y. Jan. 20, 2017). The district court queried: "If he was not making the sale, who was? No one? This makes no sense." *Id.* at *4.

The district court ruled that Flood fell within the scope of the outside salesman exemption not only because his primary duty was "making sales" but also because his primary duty was "obtain[ing] orders or contracts for services" while working away from Just Energy's offices. *Id.* at *6. In addition, the district court rejected Flood's argument that Just Energy was collaterally estopped as a result of prior litigation from invoking the outside salesman exemption. *Id.*

12

The district court further denied as moot Flood's motion for class certification. *Id. at *7.*

This appeal has followed. It arises in the context of growing division among district courts elsewhere in the country about whether Just Energy's door-to-door solicitors fall within the scope of the outside salesman exemption under the FLSA and cognate state labor laws. *Compare Dailey v. Just Energy Mktg. Corp.,* No. 14-cv-02012, 2015 WL 4498430, *2–3 (N.D. Cal. July 23, 2015) (Just Energy solicitors within scope of outside salesman exemption under California law), *with Hurt v. Commerce Energy, Inc.,* 92 F. Supp. 3d 683, 697 (N.D. Oh. Mar. 10, 2015), *on reconsideration,* No. 12-cv-758, 2015 WL 4629242 (N.D. Oh. Aug. 3, 2015), *on reconsideration,* No. 12-cv-758, 2018 WL 4203531 (N.D. Oh. Sept. 4, 2018) (Just Energy solicitors not within scope of outside salesman exemption under FLSA and Ohio law); *Wilkins v. Just Energy Grp.,* 308 F.R.D. 170 (N.D. Ill. 2015) (fact question whether Just Energy solicitors within scope of outside salesman exemption under Illinois law).

## DISCUSSION

We review a district court's award of summary judgment *de novo*, resolving all ambiguities and drawing all reasonable inferences against

13

defendant Just Energy as the moving party. *See Pippins v. KPMG, LLP*, 759 F.3d 235, 239 (2d Cir. 2014). We will affirm only if "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)).

Congress enacted the Fair Labor Standards Act some eighty years ago in order to correct "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 11 (2011). To that end, the FLSA imposes substantive wage, hour, and overtime standards, including requirements for the payment of a minimum wage and for time-and-a-half overtime pay for hours worked in excess of 40 hours during a week. *See* 29 U.S.C. §§ 206(a), 207(a)(1).

Not all employees, however, enjoy the FLSA's minimum wage and overtime pay protection. For example, Congress exempted certain classes of employees including those who work in an "executive," "administrative," "professional," or—as most relevant here—an "outside salesman" capacity. *See* 29 U.S.C. § 213(a). Although "specific references to the[se] exemptions in the legislative history are scant," the Department of Labor has suggested that these

14

exemptions were generally based "on the belief that [such] workers exempted typically earned salaries well above the minimum wage, and they were presumed to enjoy other compensatory privileges such as above average fringe benefits and better opportunities for advancement, setting them apart from the nonexempt workers entitled to overtime pay." Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees ("Defining and Delimiting"), 69 Fed. Reg. 22122-01, 22123–24, 2004 WL 865626 (Apr. 23, 2004). In addition, such work was generally considered "difficult to standardize to any time frame and could not be easily spread to other workers after 40 hours in a week, making compliance with the overtime provisions difficult and generally precluding the potential job expansion intended by the FLSA's time-and-a-half overtime premium." *Id.* at 22124; *see also Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 166 (2012) (discussing "apparent purpose of the FLSA's exemption for outside salesmen").

It is the employer that bears the burden to establish the applicability of an exemption under the FLSA. *See Young v. Cooper Cameron Corp.*, 586 F.3d 201, 204 (2d Cir. 2009). The question of how an employee spends his or her time working is one of fact, while the question of whether those work activities exempt him or

her from the FLSA is one of law. *See Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

Until recently, it was a rule of statutory interpretation that a court should narrowly construe an exemption to the FLSA in order to effectuate the statute's remedial purpose. *See, e.g.*, *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010); *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945). But that is not the rule anymore. The Supreme Court has now "reject[ed] this principle as a useful guidepost for interpreting the FLSA." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). According to the Supreme Court, "[t]he narrow-construction principle relies on the flawed premise that the FLSA pursues its remedial purpose at all costs." *Id.* (internal quotation marks omitted). Because exemptions under the FLSA are "as much a part of the FLSA's purpose as the overtime-pay requirement," the Supreme Court now instructs that courts "have no license to give the exemption anything but a fair reading." *Id.*; *see also Carley v. Crest Pumping Techs., L.L.C.*, 890 F.3d 575, 579 (5th Cir. 2018).

That brings us to consider how it is that the term "outside salesman" is defined. The statutory exemption provides an exemption for "any employee employed . . . in the capacity of outside salesman (as such [term is] defined and

16

delimited from time to time by regulations of the Secretary . . .).” 29 U.S.C. § 213(a)(1).

The Secretary of Labor in turn has defined the term “outside salesman” to mean any employee:

(1) Whose primary duty is:

(i) making sales within the meaning of section 3(k) of the Act,[4] or

(ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

(2) Who is customarily and regularly engaged away from the employer’s place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a).

The Secretary’s regulations go on to separately define each of the components for the applicability of the outside salesman exemption. One regulation defines what constitutes an employee’s “primary duty.” 29 C.F.R. § 541.500(b) (incorporating 29 C.F.R. § 541.700). Another defines what it means to be “making sales” or “obtaining orders or contracts for services.” *Id.* § 541.501; *see*

---

[4]  Section 3(k) of the FLSA specifies that the terms “sale” or “sell” include “any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.” 29 U.S.C. § 203(k).

*also Id.* § 541.503 (distinguishing "[p]romotion work" from "making sales"). Still another regulation defines what it means for an employee's work to be "outside"—that is, "[a]way from [an] employer's place of business." *Id.* § 541.502. In light of the statute's express delegation to the Secretary of Labor, all of these regulatory definitions "have the force of law as much as though they were written in the statute." *Helliwell v. Haberman*, 140 F.2d 833, 834 (2d Cir. 1944) (*per curiam*).[5]

Flood does not dispute that he was customarily and regularly engaged in his primary duties while away from the employer's place of business. So all that remains for us to consider is whether Flood's primary duty was *either* "making sales" *or* "obtaining orders or contracts for services," as those terms are defined in the regulation. We will consider each of these two possibilities in turn.

### A. Outside Salesman Exemption for "Making Sales"

Even viewing the facts in the light most favorable to Flood, they show that Flood was undoubtedly "making sales" within the scope of the outside salesman exemption. Flood spent most of every day going from door to door in an effort to

---

[5] For purposes of the outside salesman exemption, there is no need to separately discuss New York Labor Law, because as we have previously concluded it tracks the FLSA. *See Gold v. New York Life Ins. Co.*, 730 F.3d 137, 145 (2d Cir. 2013) (citing 12 NYCRR § 142–2.2 (noting that New York Labor Law's overtime provision is subject to FLSA exemptions)); NYLL § 651(5).

persuade people to buy Just Energy's products. He was not just promoting these products or advertising them; he was trying to persuade specific customers to sign up then-and-there for an energy plan. Many customers did. Flood was paid only if he successfully persuaded a customer to sign a contract to buy from Just Energy.

Nor was anyone else at Just Energy selling to Flood's customers or taking any kind of sales-oriented step toward completing the transaction. Although some of Flood's customer sign-ups did not ultimately receive Just Energy's product, this was only for technical and legal reasons involving a customer's later change of mind, failure of creditworthiness, or inability to change energy providers because of a "slam block" on the account. For those customers who received Just Energy products, they received them because Flood—and Flood alone—convinced them to buy Just Energy's products.

Flood himself had no doubt that his job was making sales. He testified that he used his skills "to sell the product that [the customer] need[ed]." J.A. 219. "[I]f you don't know your product and you don't know what you're selling, what are you doing there?" J.A. 306. When asked if he agreed that his job was "*not* doing sales," he disagreed, and he insisted that sales is "what I do." J.A. 415. He

boasted that he "probably sold in excess of 8,000 accounts, all door to door." J.A. 163.

The Department of Labor ("DOL") has made clear that "[e]mployees have a primary duty of making sales if they obtain a commitment to buy from the customer and are credited with the sale." Defining and Delimiting, 69 Fed. Reg. at 22162-63 (internal quotation marks omitted). This is precisely what Flood did. He obtained commitments to buy from customers in the form of a signed and verified customer agreement. And he was credited by commission for the customers that he persuaded to buy and who received Just Energy's products.

### 1. *Authority to Complete the Sales Transaction*

Flood argues that he was not "making sales" within the meaning of the regulatory definition because Just Energy retained discretion to reject the contracts that he secured from customers. According to Flood, his own inability conclusively to close the deal or bind the customer takes him outside the ambit of the outside salesman exemption. We do not agree that the outside salesman exemption requires a showing that a selling employee has an unconditional authority to bind the buyer or his employer to complete the sale.

20

To the contrary, in *Christopher*, the Supreme Court declined to interpret the "making sales" requirement to mandate a showing that an employee has fully consummated a sales transaction or the transfer of title to property. The plaintiffs in *Christopher* were a class of employees who worked as "pharmaceutical sales representatives" on behalf of a pharmaceutical company. *Id.* at 150. In essence, the plaintiffs' duties were to explain to doctors the features, benefits, and risks of the drugs sold by their employer and then to secure non-binding commitments from the doctors to prescribe to patients their company's pharmaceuticals. *Id.* at 151.

Notwithstanding that the sales representatives did not deal directly with a distributor, pharmacy, or consumer whose independent choice was necessary for any "sale" to occur and notwithstanding that the sales representatives secured no more than a non-binding commitment from doctors to prescribe particular drugs to their patients, the Supreme Court concluded that these representatives were within the outside salesman exemption under the FLSA. *Id.* at 165. The Supreme Court reached this result in light of the regulation's adoption of a broad definition of the term "sale"—a definition that extends beyond just the bare term "sale" to include a "contract to sell, consignment for sale, shipment for sale, or

21

other disposition." 29 U.S.C. § 203(k). As the Supreme Court explained, this broad definition negated a conclusion that a sale cannot occur unless there is a fully consummated transaction or a transfer of title to property. *Christopher*, 567 U.S. at 162-64.[6]

The Supreme Court in *Christopher* likewise cautioned against the use of technicalities to defeat the application of the outside salesman exemption: "the DOL has made it clear that 'exempt status should not depend' on technicalities, such as 'whether it is the sales employee or the customer who types the order into a computer system and hits the return button,' or whether 'the order is filled by a jobber rather than directly by the employee's own employer.'" *Id.* at 149 (quoting DOL regulatory guidance; internal brackets and citations omitted). Instead, "the Department has stressed that this ['making sales'] requirement is met whenever an employee 'in some sense make[s] a sale.'" *Id.* (internal quotation marks omitted).

---

[6] The Supreme Court's decision in *Christopher* abrogated our ruling in *In re Novartis Wage & Hour Litig.*, 611 F.3d 141 (2d Cir. 2010), which had concluded on similar facts that pharmaceutical sales representatives were not within the scope of the outside salesman exemption, in large part because they did not actually consummate a sale or transfer title to property. *Id.* at 154 ("In sum, where the employee promotes a pharmaceutical product to a physician but can transfer to the physician nothing more than free samples and cannot lawfully transfer ownership of any quantity of the drug in exchange for anything of value, cannot lawfully take an order for its purchase, and cannot lawfully even obtain from the physician a binding commitment to prescribe it, we conclude that it is not plainly erroneous to conclude that the employee has not in any sense, within the meaning of the statute or the regulations, made a sale.").

Flood argues that *Christopher* should be confined to the peculiarities of the pharmaceutical sales market that impeded direct sales from the pharmaceutical company to patients. To similar effect, one district court has concluded that "[t]he distinguishing characteristic in *Christopher* was that the pharmaceutical representatives were legally prohibited from actually selling drugs to patients" and that "[b]ecause of the regulatory scheme, the best the pharmaceutical representatives could do was to promote drugs to doctors, who would in turn prescribe them to patients." *Hurt*, 92 F. Supp. 3d at 697. The court in *Hurt* concluded that "if the employer retains and/or exercises discretion to accept and/or reject any transaction for reasons that are unrelated to regulatory requirements applicable to the industry, the transaction should not be considered a sale for purposes of the Fair Labor Standards Act." *Id.* at 695.

We do not agree. Although *Christopher* noted that the regulatory context barred an employee from selling the company's drugs directly to a consumer without a doctor's prescription, *Christopher*, 567 U.S. at 150 & n.4, and that courts must adopt "a functional, rather than a formal, inquiry, one that views an employee's responsibilities in the context of the particular industry in which the employee works," *Id.* at 161, *Christopher* does not further suggest that its

23

reasoning and interpretation of the statute and regulations lack general applicability to other cases arising under the FLSA. Nor does *Christopher* state any baseline rule or presumption that a salesman is not "making sales" unless the salesman persuades customers to engage in binding purchase commitments not subject to any discretionary review or intervention by the employer or any third party.

Flood does not point to any peculiarity of the utility or energy industry that should warrant a more restrictive application of the term "making sales" for purposes of the outside salesman exemption. The fact that Just Energy—like any prudent business—might occasionally decline to go through with a transaction (for example, if it turns out that the customer changes her mind or if the customer is not creditworthy) does not alter the character of Flood's own activities to retroactively transform them into something other than "making sales" as the regulations provide.

Indeed, Flood's primary duties were more in the nature of "making sales" than the primary duties of the representatives at issue in *Christopher*. Unlike the sales representatives in *Christopher* who did not deal with any party who would actually engage in a sales transaction (*e.g.*, a distributor, pharmacy, or consumer),

24

Flood dealt directly with the party—face-to-face with the customer at the door—who would actually purchase Just Energy's product.

Although the completion of the transaction depended on technical contingencies that we have described, there is no mistaking that Flood received a "commitment to buy from the person to whom he [was] selling." Defining and Delimiting, 69 Fed. Reg. at 22163. And it is this commitment that suffices to constitute the making of a sale for purposes of the outside salesman exemption. "The touchstone for making a sale, under the Federal Regulations, is obtaining a commitment," *Clements v. Serco, Inc.*, 530 F.3d 1224, 1227 (10th Cir. 2008), and "the statutory language does not require a final sale, complete and consummated." *Baum v. AstraZeneca LP*, 605 F. Supp. 2d 669, 680 (W.D. Pa. 2009) (dealing with the outside salesman and administrative exemptions), *aff'd*, 372 F. App'x 246 (3d Cir. 2010) (affirmed on the basis of the administrative exemption).

It is the commitment to buy that Flood secured from each customer that readily distinguishes this case from those relied on by Flood. In *Clements*, for example, the Tenth Circuit concluded that civilian military recruiters were not outside salesmen because they could not secure a commitment from the prospective recruits. *See Clements*, 530 F.3d at 1228. The recruiters in *Clements* did

25

no more than persuade candidates to show up for an all-day session at a military recruitment center where they were subject to a physical exam, interview, and guidance counseling by army personnel, all before the candidate would finally decide whether to sign an oath of enlistment. *Id.* at 1226. The recruiters were merely stimulating interest in military, but not obtaining a commitment.

Similarly, in *Wirtz v. Keystone Readers Serv., Inc.*, 418 F.2d 249 (5th Cir. 1969), the Fifth Circuit declined to apply the outside salesman exemption to students who went door to door soliciting magazine subscriptions. The students in *Wirtz* were directed to ascertain whether prospective customers met certain qualifications and have them complete an initial "[o]rder [c]ard" but not to collect any money; only then did separate student managers later contact the prospect to see if he or she met the qualifications and describe the payment plan, all before the prospect executed an order contract. *Id.* at 252. The prospects' initial order cards "had no *independent significance* for the company apart from their obvious function as leads or comeons." *Id.* at 260. The door-to-door students did no more than identify those who were "receptive to the idea of purchasing

magazine subscriptions," *id.* at 260, all prior to separate one-to-one intervention with the prospect by student managers.[7]

In *Gregory v. First Title of Am., Inc.*, 555 F.3d 1300, 1309-10 (11th Cir. 2009) (*per curiam*), the Eleventh Circuit distinguished *Wirtz* on grounds that are equally applicable to the case before us now. In *Gregory*, the Eleventh Circuit applied the outside salesman exemption to affirm the grant of summary judgment against an employee who worked as a title insurance sales representative. The Eleventh Circuit observed that "once Gregory obtained the orders [for title insurance], the sales process was complete," and that "[t]here was no intervening sales effort between her efforts and the consummation of the sale." *Id.* at 1310. "Gregory, unlike the student salesmen in *Wirtz*, did not 'pave the way' for another salesperson to consummate the sale, but rather obtained the orders herself. And once the orders were obtained, the sale was complete." *Id.*

We have previously cited *Gregory* with approval for the proposition that there is a "distinction between obtaining commitments to buy and promoting sales by other persons," and we have described *Gregory* to hold that an

---

[7] Both *Clements* and *Wirtz* were decided against the pre-*Encino* landscape, in which exemptions were to be construed narrowly. *See Clements,* 530 F.3d at 1227; *Wirtz,* 418 F.2d at 261. But, as noted above, the law no longer requires FLSA exemptions to be construed narrowly.

"employee who obtained commitments to buy her employer's title insurance service and was credited with those sales, and all of whose efforts were directed towards the consummation of her own sales and not towards stimulating sales for the employer in general, was an outside sales employee within the meaning of the FLSA and the regulations." *Novartis Wage & Hour Litig.*, 611 F.3d at 152, *abrogated on other grounds by Christopher*, 567 U.S. 142. As all this makes clear, the proper focus for the "making sales" inquiry is whether the employee has obtained a commitment to buy the employer's product, not whether the employer retains some after-the-fact discretion to decline to go through a transaction to which the buyer has otherwise committed.

Our conclusion is reinforced by way of analogy and example in the regulations concerning when a truck driver who engages in some sales activity as a part of the truck delivery job may fall within the outside salesman exemption. *See* 29 C.F.R. § 541.504 ("Drivers who sell"). The regulation provides that "[d]rivers who may qualify as exempt outside sales employees include:

. . . .

(2) A driver who obtains or solicits orders for the employer's products from persons who have authority to commit the customer for purchases.

(3) A driver who calls on new prospects for customers along the employee's route and attempts to convince them of the desirability of accepting regular delivery of goods."

§ 541.504(c). This regulation's allowance of the exemption for direct solicitation for specific orders regardless of the lack of a completed sales transaction is another significant sign that the outside salesman exemption does not require evidence of a completed sales transaction, much less evidence that the employee alone has control over and has taken all steps necessary to complete a sales transaction.

In sum, the outside salesman exemption does not require that the employee have the ultimate authority to bind the customer or close the deal. It is enough that the employee secures a customer's commitment to engage in a sales transaction as the term "sale" is broadly defined by the law. Therefore, the fact that Just Energy retained a right to reject any contract that Flood secured does not create a genuine issue of material fact about whether he or other plaintiffs were "making sales." *See Dailey*, 2015 WL 4498430, at *3 (concluding that "Just Energy's retention of the right to cancel a contract based on the third-party verification call or a credit check—or any other reason—does not change the fact that Plaintiff's job duties involved the 'selling' of or 'obtain[ing] orders or

29

contracts for' Just Energy's services" and rejecting contrary argument that "would exalt form over substance").

### 2. *External Indicia*

Flood next argues that so-called "external indicia" of his activities raise a genuine fact issue about whether he was "making sales" within the meaning of the outside salesman exemption. He relies in part on language from the end of the *Christopher* opinion, in which the Supreme Court noted that the pharmaceutical sales representatives "bear all of the external indicia of salesmen [as] provid[ing] further support for our conclusion." 567 U.S. at 165. In describing what these "external indicia" were, the Supreme Court observed that the representatives "were hired for their sales experience," that "[t]hey were trained to close each sales call by obtaining the maximum commitment possible from the physician," and that "[t]hey worked away from the office, with minimal supervision." *Id.* at 165-66.

This passing reference in *Christopher* to "external indicia" of a sales person was secondary to the Supreme Court's primary analysis of whether the "making sales" requirement was satisfied in the first place. It is not surprising that little reliance was placed on such "external indicia," because no such listing of indicia

30

appears in the relevant regulation defining what it means for an employee to be "making sales."[8] The regulations that define "making sales" do not include any reference, for example, to an employee's prior sales experience (much less whether this experience was the reason he or she was hired), the employee's specific type of sales training, or degree of supervision. *See* 29 C.F.R. § 541.500(a); 29 C.F.R. § 541.501.

Although it is true that related regulations refer to factors such as sales training and the degree of supervision (among many other factors), these related regulations concern an analytically distinct issue of whether an employee's "primary duty" is "making sales," rather than whether those duties amount to "making sales" at all.[9] *See Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 472 (S.D.N.Y. 2008) (noting proper applicability of "external indicia" factors to "'mixed duties' cases, where the employees engage in sales and also perform a

---

[8] Our concern about relying on unwritten "external indicia" to tell us whether an employee is "making sales" is magnified by Flood's citation to district court cases that describe such "external indicia" in yet more numerous and expansive terms than described by the Supreme Court itself in *Christopher*. *See, e.g., Hurt*, 92 F. Supp. 3d at 695-96; *Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747, 756 (W.D. Mich. 2003).

[9] *See* 29 C.F.R. § 541.504(b) (listing "sales training" among several factors to be considered when deciding whether a driver who engages in both non-exempt driving and exempt sales activity should be considered to have a "primary duty of making sales"); § 541.700(a) (noting that "[f]actors to consider when determining the primary duty of an employee include . . . the employee's relative freedom from direct supervision"); § 541.700(c) (assistant managers with a mixture of exempt and non-exempt duties would "not satisfy the primary duty requirement" if "such assistant managers are closely supervised and earn little more than the nonexempt employees").

significant amount of non-sales work" and that "[i]n such cases, the question is not—as it is here—whether the employees make sales at all, but whether their work *primarily* consists of making those sales").

Here, by contrast, Flood's argument is that his door-to-door solicitation activities did not involve "making sales" at all. He has not argued, in the alternative, that if his door-to-door activities involved "making sales," then these activities were *not* his primary duty as a Just Energy employee. Nor could he reasonably make this argument in light of the evidence that he spent 75-80% of his time engaged in door-to-door solicitation from which all of his commission income was derived.

So there is good reason to doubt the weight that any unwritten "external indicia" should be given when deciding if an employee is "making sales" as defined under the outside salesman exemption. But even taking such indicia into account here, we are not convinced that they create a genuine issue of fact to suggest that Flood was *not* "making sales" in this case. To the contrary, Flood had prior sales experience. Flood was extensively trained by Just Energy in selling techniques. From each customer Flood secured the "maximum commitment possible," *Christopher*, 567 U.S. at 166, by having the customer sign

an agreement before he left the premises. Flood's entire compensation was from commissions he earned when he convinced customers to obtain their energy from Just Energy. These are all powerful indicia that Flood was indeed a salesman and doing just what he himself thought he was doing: making sales.

Ultimately, Flood's "external indicia" argument reduces to an argument about just one of the many external indicia factors: *supervision*—that Just Energy engaged in too much supervision for him to be deemed an outside salesman. As Flood points out, he had to work prescribed hours. He had to attend morning meetings at the company office. He was driven to and from pre-selected locations by company personnel. He had to abide by a company dress code. And he had to use a company sales script.

All this is true. But the absence of substantial supervision has never been a pre-condition to the application of the outside salesman exemption. *See, e.g.*, *Jewell Tea Co. v. Williams*, 118 F.2d 202, 204–08 (10th Cir. 1941) (affirming judgment against plaintiff traveling salesmen notwithstanding that the employer subjected them to specific early-morning reporting hours, extensive and repeat training on selling methods, driving of company cars, and day-to-day adherence to rotating company-designated sales routes).

Although Flood invokes the purported "spirit and purpose" of the FLSA to suggest that direct supervision of an outside salesman negates the reason for an outside salesman exemption, "[i]t is quite mistaken to assume . . . that whatever might appear to further the statute's primary objective must be the law." *Encino Motorcars, LLC,* 138 S. Ct. at 1142 (quoting *Henson v. Santander Consumer USA Inc.,* 137 S. Ct. 1718, 1725 (2017)). "For these reasons and more besides we will not presume with [plaintiffs] that any result consistent with their account of the statute's overarching goal must be the law but will presume more modestly instead 'that [the] legislature says . . . what it means and means . . . what it says.'" *Henson,* 137 S. Ct. at 1725 (quoting *Dodd v. United States*, 545 U.S. 353, 357 (2005)).

In the absence of words in the statute or regulation that require consideration of the degree of supervision when deciding if an employee is "making sales," we decline to add a "subject to supervision" exception to the "making sales" requirement of the outside salesman exemption under the FLSA. Nor can we conclude that, standing alone, the degree of Just Energy's supervision somehow creates a genuine fact issue in this case about whether Flood was "making sales" as he thought he was. The district court did not err when it concluded that there was no triable fact issue about whether Flood or

34

any of the plaintiffs were "making sales" within the meaning of the outside salesman exemption.

### B.  *Obtaining Order or Contracts for Services*

The district court ruled on alternative grounds that Flood was within the scope of the outside salesman exemption because he was "obtain[ing] orders or contracts for services." *Flood*, 2017 WL 280820, at *6 (quoting 29 C.F.R. § 541.500(a)(1)(ii)). As the text of the regulation makes clear, the "obtaining orders or contracts for services" grounds for the outside salesman exemption is distinct from the "making sales" grounds. 29 C.F.R. § 541.500(a)(1) (using the word "or" when describing potential primary duties of an outside salesman); *see also Christopher*, 567 U.S. at 148 n.2 (noting that the "obtaining orders or contracts for services" portion of the definition was not at issue in that case).

The regulations provide that "[e]xempt outside sales work includes not only the sales of commodities, but also 'obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer.'" 29 C.F.R. § 541.501(c). In elaborating on this separate basis for application of the exemption, the regulations note that it extends to "employees who sell or take orders for a service, which may be performed for the customer

35

by someone other than the person taking the order." *Id.* § 541.501(d). This makes clear that the fact that someone else at Just Energy ended up furnishing the energy service to the customer does not defeat a conclusion that it was Flood who qualified for the exemption because he took orders for the service in the first instance.

The record is otherwise clear that Flood's job was to obtain orders or contracts for services. He persuaded potential customers to order their energy supply from Just Energy, and, if successful, he departed the home of the customer with a signed contract in hand. *See Gregory*, 555 F.3d at 1308-09 (title insurance representative was exempt on grounds that she was "obtaining orders or contracts for services" where solicitation activities resulted in issuance of policies and without further solicitation effort by title insurance company). For all other reasons we have discussed why Flood was "making sales," we conclude *a fortiori* that he was also "obtaining orders or contracts for services" within the scope of the outside salesman exemption.[10] In sum, the district court correctly

---

[10] The district court concluded that Just Energy's products were "services" within the meaning of the outside salesman exemption, 2017 WL 280820, at *6, and plaintiffs have not challenged this aspect of the district court's ruling on appeal.

concluded that plaintiffs were exempt as outside salesman employees under the FLSA.

**C.** *Collateral Estoppel*

Flood argues that the district court erred when it declined to apply collateral estoppel against Just Energy in light of the adverse judgment against it in *Hurt v. Commerce Energy, Inc.*, 92 F. Supp. 3d 683 (N.D. Oh. Mar. 10, 2015), *on reconsideration*, 2015 WL 4629242 (N.D. Oh. Aug. 3, 2015), *on reconsideration*, 2018 WL 4203531 (N.D. Oh. Sept. 4, 2018).[11] The *Hurt* case involves similar facts involving door-to-door solicitation and the same Just Energy parties (or their privies) as this case. The Northern District of Ohio in *Hurt* concluded after a jury trial that Just Energy employees were not exempt outside sales employees. *See* 92 F. Supp. 3d at 688–93.

The doctrine of offensive collateral estoppel allows a plaintiff to preclude a defendant from relitigating an issue that has been previously decided against the same defendant. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979). "In order for a plaintiff to bar a defendant from litigating an issue on collateral

---

[11] Two of the three Just Energy defendants in *Hurt* are defendants in the case now before us, and Just Energy does not dispute that the third of the defendants (Just Energy's New York affiliate) is in privity with the parties in *Hurt* for collateral estoppel purposes.

estoppel grounds:  (1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits." *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 37 (2d Cir. 2005); *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986).

In addition to the four factors listed above, a court must also satisfy itself that application of offense collateral estoppel is fair. *See Parklane Hosiery*, 439 U.S. at 331; *Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*, No. 17-cv-361, 2018 WL 3650826, at \*6 (2d Cir. Aug. 2, 2018); *Bear, Stearns & Co., Bear, Stearns Sec. Corp. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005). A trial court or other adjudicator "is generally accorded 'broad discretion' in determining whether or not collateral estoppel should apply in a given case." *Bear, Stearns & Co.*, 409 F.3d. at 91-92 (quoting *Parklane Hosiery*, 439 U.S. at 331).

We review a district court's assessment of whether it is unfair to apply offensive collateral estoppel under an abuse of discretion standard. *See Bear, Stearns & Co.*, 409 F.3d at 92; *see also Parklane*, 439 U.S at 331 (concluding that trial

38

courts should be granted "broad discretion to determine when [offensive collateral estoppel] should be applied" given the potential for unfairness to defendants). However, if a court chooses to apply the doctrine of collateral estoppel to a particular case, we review its application of the factors *de novo*. *See Chartier v. Marlin Mgmt., Inc.*, 202 F.3d 89, 93-96 (2d Cir. 2000) (assessing whether the district court was correct in finding a previous decision was final for collateral estoppel purposes).

As an initial matter, the *Hurt* court addressed only the "making sales" prong of the outside salesman exemption; it did not address the "obtaining orders or contracts for services" prong of the exemption. *See Hurt*, 92 F. Supp. 3d at 689. For this reason alone, collateral estoppel cannot apply to foreclose the district court's grant of summary judgment on this alternative ground against Flood.

Nor did the district court abuse its discretion when it concluded that it would be unfair to apply collateral estoppel against Just Energy in this case. First, Just Energy has not had an adequate opportunity for appellate review of the adverse *Hurt* decision. That decision has not proceeded yet to final judgment, and the Sixth Circuit has declined to grant interlocutory review. *See Gelb*, 798

39

F.2d at 44 (noting that "[a]ppellate review plays a central role in assuring the accuracy of decisions" and that "although failure to appeal does not prevent preclusion, . . . inability to obtain appellate review, or the lack of such review once an appeal is taken, does prevent preclusion").

The lack of appellate review is of particular concern in light of the acknowledgement by both the Northern District of Ohio and the Sixth Circuit that the interpretation of "making sales" is uncertain and subject to dispute among courts. *See Hurt*, 2015 WL 4629242, at *3 (noting that "there are some grounds for a difference of opinion as to the application of *Christopher* in this case" and that "there is some uncertainty as to what it means to be 'making sales' within this particular industry"); *In re Commerce Energy, Inc.*, 15-0304-cv, Doc. 8-2 (6th Cir. 2015) (noting that "various courts have interpreted these issues differently").

In addition, as the district court noted, the Northern District of California has come to a different conclusion concerning the scope of the outside salesman exemption than the Northern District of Ohio. *See Flood*, WL 280820, at *6 (citing *Dailey*, 2015 WL 4498430, at *4).[12] We agree with the district court that it would

---

[12] Flood correctly points out that *Dailey* involved California state wage and hour law rather than the federal FLSA. The issue of whether an employee is "making sales" under both laws is sufficiently similar

40

not be fair to allow plaintiffs to cherry-pick a decision in their favor to invoke collateral estoppel, while at the same time overlooking a decision that holds against them. "'Allowing offensive collateral estoppel may . . . be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant.'" *Bear, Stearns & Co.*, 409 F.3d at 91 (quoting *Parklane Hosiery*, 439 U.S. at 330). Thus, for example, "if a railway accident injured 50 people, and the first 25 people who sued the railroad lost, and the 26th person won, the remaining plaintiffs ought not be able to win by estoppel." *Id.* Accordingly, we conclude that the district court neither erred nor abused its discretion when it declined to allow plaintiffs to apply offensive collateral estoppel against Just Energy to prevent it from claiming the benefit of the outside salesman exemption.

**D.** *New York Labor Law*

Lastly, Flood argues that the district court improperly dismissed Count Three of the complaint—a claim for violation of NYLL § 191. Although the district court did not specifically explain its reasons for dismissing Count Three

---

to render application of collateral estoppel unfair in this case. *See Brody v. AstraZeneca Pharm., LP*, No. 06-cv-6862, 2008 WL 6953957, at *6 (C.D. Cal. June 11, 2008) (discussing relationship between the "making sales" analysis under California law and the FLSA and looking to federal law to determine whether employees were exempt outside salesmen).

in its ruling, we may affirm on any grounds that are supported in the record. *See*

*United States v. Cramer*, 777 F.3d 597, 603 (2d Cir. 2015).

Count Three alleges a violation of NYLL § 191(1)(a) in that "Defendants[] fail[ed] to pay Plaintiff and other Class members for each hour worked, and fail[ed] to pay wages weekly and not later than seven calendar days after the week in which the wages were earned . . . ." J.A. 50 (¶ 73). The evidence here, however, is undisputed that Flood agreed to be paid by means of commission, not by hourly wages. The complaint does not further allege that Just Energy failed to timely pay commissions, which conduct would violate a separate labor law provision, NYLL § 191(1)(c), that was not alleged in the complaint.[13] Accordingly, the district court did not err when it dismissed Count Three, because it is clear that there is no genuine issue to be tried as to any fact material to Flood's claim that Just Energy failed to timely pay him any hourly wages.

---

[13] Moreover, even if Flood had included such allegations, as the district court noted in its opinion, "[t]here is no evidence in the record to support this contention [of withdrawn commissions] other than plaintiff's speculation . . . ." *Flood*, 2017 WL 280820, at *4. When Flood was asked whether he had proof of Just Energy converting his accounts to company accounts, he could not provide any. *See, e.g.*, J.A. 318 ("How would I prove that? I don't know."); J.A. 372 ("I can't show it to you in writing."). Furthermore, claims related to the claw-back of first-year commissions would be precluded by the language of § 191(1)(c), which says wages will be paid "in accordance with the agreed terms of employment." NYLL § 191(1)(c); *see also* J.A. 2267 (describing provisions relating to potential claw-backs).

## CONCLUSION

We have considered all of plaintiffs' remaining arguments and find them to be without merit. For the foregoing reasons, we AFFIRM the judgment of the district court.