**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 1, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GARY CLEMENTS and DAVID
GERBER,

      Plaintiffs-Appellees/
      Cross-Appellants,

     v.

SERCO, INC.,

      Defendant-Appellant/
      Cross-Appellee,

_____

FAIRFAX COUNTY CHAMBER OF
COMMERCE,

      Amicus Curiae.

Nos. 06-4316 & 07-4005

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 04-CV-1008-DB)**

---

Lino S. Lipinsky de Orlov (Herbert L. Fenster and Jennette Campopiano Roberts
with him on the briefs), McKenna Long & Aldridge LLP, Denver, Colorado, for
Defendant-Appellant/Cross-Appellee.

Richard M. Hymas (Erin T. Middleton with him on the briefs), Durham Jones &
Pinegar, Salt Lake City, Utah, for Plaintiffs-Appellees/Cross-Appellants.

Daniel B. Abrahams and Shlomo D. Katz, Epstein Becker & Green, P.C.,
Washington, D.C., on the brief for Amicus Curiae.

Before **MURPHY**, **SEYMOUR**, and **McCONNELL**, Circuit Judges.

**MURPHY**, Circuit Judge.

Serco, Inc. ("Serco") appeals the district court's ruling on summary judgment that civilian military recruiters employed by the company are entitled to overtime compensation under the Fair Labor Standards Act ("FLSA"). We conclude that because Serco's employees did not obtain commitments from recruits, they were not engaged in sales. They therefore do not fall under FLSA's "outside salesmen" exemption. The employees, Gary Clement and David Gerber ("Employees"), cross-appeal the district court's calculation of back-pay based on the "fluctuating workweek" approach, and ask this court to remand for calculation under the "time-and-a-half" method. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **affirm** the district court's summary judgment ruling and its calculation of back-pay.

## I.    Factual Background

The United States Army contracted with Serco[1] in 2002 to provide recruiting services to the Army and the Army Reserves. Under the Army-Serco contract, Serco was paid every time its recruiting efforts resulted in one of the

---

[1]The original contract was signed by Resource Consultants, Inc. On December 31, 2006, Resource Consultants was merged into Serco. Serco was then substituted for Resource Consultants in this litigation.

following: (1) a recruit with no prior military experience enlisted in the U.S.

Army or the U.S. Army Reserves; (2) a member of the U.S. Army Reserves

transferred to the U.S. Army; (3) a former member of the military enlisted in the

U.S. Army or U.S. Army Reserves; or (4) an applicant shipped to his or her

assigned training center.  Both Clements and Gerber were hired by Serco in

September 2002 to recruit potential applicants for the U.S. Army and U.S. Army

Reserves.  Gerber's employment ended in June 2003 and Clements' in August

2003.

The parties describe the Employees' duties differently.  The Employees

characterize their jobs as cold-calling individuals to inform them about

opportunities to serve in the U.S. Army or U.S. Army Reserves.  The Employees

testified that they spent most of their time in Serco's office making phone calls to

prospective recruits.  Serco, on the other hand, cites to deposition testimony and

affidavits describing the nature of the job as one in which the Employees were

expected to be in the community, actively recruiting applicants.[2]  The job

description required recruiters to establish a working relationship with

---

[2]Serco included two government documents discussing military recruiting and portions of the Army-Serco contract in their appendix.  These materials were not before the district court.  As such, we decline to consider them in our review. *See United States v. Kennedy*, 225 F.3d 1187, 1191 (10th Cir. 2000) ("This court will not consider material outside the record before the district court."); *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 838 F.2d 904, 907 (7th Cir. 1988) ("A litigant cannot put in part of his case in the trial court and then, if he loses, put in the rest on appeal.").

representatives of educational, parental, civic, military, religious, social, and fraternal organizations and to give formal and informal presentations on the advantages of serving in the Army. Recruiters were also to distribute and display publicity materials to high school and college students.

Once a recruit expressed interest, the Employees set up an initial interview and administered pre-screening math and English tests to determine if the recruit met the minimum requirements for enlistment. If the requirements were met, the Employees maintained contact with the recruit and engaged in other follow-up activities, such as obtaining background checks, court records, birth certificates, health records, and other documents required for enlistment.

The Employees had no authority to enlist a recruit. Instead, recruits were enlisted at a Military Entrance Processing Station ("MEPS"), owned and operated by the United States. At the MEPS, a recruit first underwent a physical exam. If she passed, she interviewed with U.S. Army officials and decided whether to enlist. Recruits also met with guidance counselors to discuss the various jobs available to the recruit. Recruits spent an entire day at the MEPS, usually starting at six o'clock in the morning and ending at three or four o'clock in the afternoon. A recruit could only sign an Oath of Enlistment in the Armed Forces of the United States at the MEPS. The Employees, although unable to enlist a recruit, often drove their recruits to the MEPS, and then returned at the end of the day to give them a ride home.

After a recruit enlisted, the Employees met with recruits regularly. They provided additional training and often made telephone calls to the recruits to reinforce their decision to join the U.S. Army or U.S. Army Reserves. The goal of this continued contact was to keep the recruits enthused about their decision to enlist.

Serco paid the Employees a starting salary of $600.00 per week. The Employees' salaries were nominally increased in February 2003. Additionally, Serco paid a commission if the Employees reached established quotas for recruits who enlisted and reported to their assigned training center. The Employees kept time cards which were submitted to a supervisor at the end of each week or pay period. Clements worked 480 overtime hours and Gerber worked 596.5 overtime hours. Serco, however, did not pay either employee overtime.

## II.    Analysis

Congress enacted the FLSA in order to improve "labor conditions detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). To further this remedial aim, the FLSA requires employers to pay time and one-half to employees who work more than forty hours a week and who are not exempt. 29 U.S.C. § 207(a)(2)(C). The FLSA exempts employees who are classified as "outside salesmen" from the overtime-pay requirement. 29 U.S.C.

§ 213(a)(1).  Congress delegated authority to the Secretary of Labor to define this

exemption.  *Id.*

Exercising the delegated authority, the Secretary promulgated 29 C.F.R.

§ 541.500, defining "outside salesman" as any employee:

> (a) who is employed for the purpose of and who is customarily and
> regularly engaged away from his employer's place or places of
> business in:
>
>> (1) making sales within the meaning of section 3(k) of the Act;
>> or
>>
>> (2) Obtaining orders or contracts for services or for the use of
>> facilities for which a consideration will be paid by the client or
>> customer; and
>
> (b) Whose hours of work of a nature other than that described in
> paragraph (a)(1) or (2) of this section do not exceed 20 percent of the
> hours worked in the workweek by nonexempt employees of the
> employer: Provided, that work performed incidental to and in
> conjunction with the employee's own outside sales or solicitations,
> including incidental deliveries and collections, shall not be regarded
> as nonexempt work.

29 C.F.R. § 541.500 (2003).[3]  Under § 3(k) of the FLSA, the word "'[s]ale' or

'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment

for sale, or other disposition."  29 U.S.C. § 203(k).  The district court ruled the

Employees were not "outside salesmen" as defined by the regulations because the

recruiters were not engaged in sales and, even if the Employees were engaged in

---

[3]The regulations governing the "outside salesman" exemption were
amended on August 23, 2004.  The prior regulations, however, govern this case
and all citations to the C.F.R. herein refer to the 2003 version of the regulations.

sales, Serco failed to prove the Employees' nonexempt work did not exceed twenty percent of the hours worked, as required by 29 C.F.R. § 541.500(b).

We review the grant of a summary judgment motion de novo, viewing all evidence and reasonable inferences in the light most favorable to the nonmoving party. *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1222-23 (10th Cir. 2008). "[I]n light of the FLSA's broad remedial aims, exemptions must be narrowly construed." *Ackerman v. Coca-Cola Enters., Inc.*, 179 F.3d 1260, 1264 (10th Cir. 1999). Further, as the employer, Serco bears the burden of proving that the Employees fit "plainly and unmistakably within the exemption's terms." *Id.* (quotation and alteration omitted); *see also Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). "The Department of Labor regulations are entitled to judicial deference and are the primary source of guidance for determining the scope of exemptions to the FLSA." *Ackerman*, 179 F.3d at 1264 (quotation and alteration omitted); *see also Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843-44 (1984).

Serco argues the district court erred by concluding the Employees were not outside salesmen because they did not have the authority to "close the sale." The inability of the Employees, Serco contends, to accompany recruits into the MEPS and obtain their commitment, by way of signing the Oath of Enlistment, is not dispositive. No one other than the Employees "sold" the Army to the recruits. We disagree. Although the Employees engaged in sales training and "sold" the

-7-

idea of joining the Army to potential recruits, it did not engage in sales work as defined by the Department of Labor regulations.

The touchstone for making a sale, under the Federal Regulations, is obtaining a commitment. This can be done by making a sale or obtaining an order or contract for services. 29 C.F.R. § 541.500. This requirement is spelled out in numerous Department of Labor regulations. For example, 29 C.F.R. § 541.504 explains that promotional work is not exempt, unless it is actually performed incidental to and in conjunction with an outside employee's own sales. By way of illustration, the regulation describes a distribution scenario in which a manufacturer's representative visits a retailer:

> This manufacturer's representative may perform various types of promotional activities such as putting up displays and posters, removing damaged or spoiled stock from the merchant's shelves or rearranging the merchandise. Such persons can be considered salesmen only if they are actually employed for the purpose of and are engaged in making sales or contracts. To the extent that they are engaged in promotional activities designed to stimulate sales which will be made by someone else the work must be considered nonexempt.

*Id.* § 541.504(b)(2). The regulation further explains, "the test is whether the person is actually engaged in activities directed toward the consummation of his own sales, at least to the extent of *obtaining a commitment* to buy from the person to whom he is selling. If his efforts are directed toward stimulating the sales of his company generally rather than the consummation of his own specific sales his activities are not exempt." *Id.* (emphasis added); *see also id.* C.F.R. § 541.503

-8-

(explaining sales work includes "any other work performed by the employee in furthering his own sales efforts").

This concept is illustrated in *Wirtz v. Keystone Readers Serv., Inc.*, 418 F.2d 249 (5th Cir. 1969). Students were engaged in door-to-door sales of magazine subscriptions and sued their employer for overtime compensation. *Id.* at 252. The employer claimed the student salesmen were "outside salesmen" under the FLSA. *Id.* at 253. The court disagreed. Although the students solicited orders from potential customers, their role in making the sale was limited. The door-to-door student salesmen were instructed to ascertain whether the prospect met certain qualifications but were prohibited from collecting money. *Id.* at 252. All order forms collected by the salesmen were turned over to student managers who subsequently contacted the prospect, confirmed the prospect met the qualifications, and explained the payment plan. *Id.* Only then was a contract executed. The Fifth Circuit held the student salesmen were only engaged in promotional work; they gathered a list of potential customers who were "receptive to the idea of purchasing magazine subscriptions." *Id.* at 260-61. The salesmen's work paved the way for a sale made by someone else: the student manager. *Id.* Narrowly construing the exemption, the court explained the student salesmen were nothing more than "pseudo-salesmen" and thus not within the coverage of the outside salesmen exemption. *Id.* at 261.

Although a civilian military recruiter is in many ways unlike a student selling magazines door to door, the parallels between these two cases lead us to conclude the Employees likewise engaged in promotional work, paving the way for someone else—the United States Army—to make the sale. Serco contests this characterization, arguing no one at the MEPS could have "sold" the recruit on joining the Army. Even when viewing the evidence in the light most favorable to Serco, the record does not support this contention. It was *only* at the MEPS that a recruit could pass the needed physical to enlist, choose a suitable job, and sign an oath to enlist. Before a recruit arrived at the MEPS, no "order or contract" had been obtained; the Employees merely cultivated "a list of persons who seem[ed] receptive to the idea" of joining the Army. *Wirtz*, 418 at 260; *see also Ackerman*, 179 F.3d at 1266.

This conclusion is further supported by two Department of Labor opinion letters and a case from the Western District of Michigan examining whether college recruiters qualify for the outside salesman exemption. Agency opinion letters "do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). They are, however, "entitled to respect under [] *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the power to persuade." *Id.* (quotations omitted). The Department of Labor's opinion letters on college recruiters each state:

> Ordinarily, an individual who regularly performs recruitment for a college is not engaged in making sales of the college's services, or obtaining contracts for its services. Rather, college recruitment activity appears analogous to sales promotion work, since, like a promotion person who solicits customers for a business, the college recruiter is engaged in identifying qualified customers, i.e., students, and inducing their application to the college, which in turn decides whether to make a contractual offer of its educational services to the applicant.

Opinion Letter from Dept. of Labor, Wage and Hour Div. (Feb. 19, 1998), 1998 WL 852683; Opinion Letter from Dept. of Labor, Wage and Hour Div. (Apr. 20, 1999), 1999 WL 1002391. Thus, the college recruiters were not outside salesmen because they did not obtain commitments to purchase educational services; instead, they promoted the college's services and paved the way for the college to make a contractual offer.

Serco argues its employees, however, are more akin to the "field representatives" in *Nelson v. DeVry, Inc.*, 302 F. Supp. 2d 747, 750 (W.D. Mich. 2003). Much like the civilian recruiters, field representatives are assigned a specific territory and through phone calls, high school visits, and student appointments, seek to recruit students to enroll at DeVry, a for-profit, technology-based higher education institution. *Id.* After identifying eligible candidates, the field representatives assist potential candidates in completing their application. *Id.* Unlike the college recruiters discussed in the Department of Labor's opinion letters, however, DeVry's field representatives have the authority to obtain a commitment from a prospective student. *Id.* at 756. DeVry uses strictly objective

-11-

criteria for admission. Thus, the district court in *DeVry* concluded "[i]f anyone made a decision pertaining to admissions, it was the field representatives, who were responsible for sorting out from the general population of prospective students which ones were DeVry material." *Id.*

Although the Employees' job duties appear quite similar to those of the field representatives in *DeVry*, they differ in an important aspect. Unlike the field representatives, who could offer a prospective student admission to DeVry, Serco's civilian military recruiters could only lay the groundwork. It was the Army—and only the Army—who could enlist a recruit. Thus, the Employees operated more like the college recruiters described in the Department of Labor's opinion letters than *DeVry*'s field representatives. Because the Employees were not engaged in sales, as defined by the Department of Labor's regulations, they were not "outside salesmen." We therefore affirm the district court.[4]

---

[4]We note it is possible that even if Serco's employees had obtained commitments from recruits, they would still not qualify as outside salesmen. A good argument can be made that "sales" in this context is used in the metaphorical sense only; instead, the Employees acted as "outside buyers." It is the recruit, not the Army, who is offering a service. An "outside buyer" is not exempt from the FLSA:

> The inclusion of the word "services" is not intended to exempt persons who, in a very loose sense, are sometimes described as selling "services." For example, it does not include persons such as servicemen even though they may sell the service which they themselves perform. Nor does it include outside buyers, who in a very loose sense are sometimes described as selling their employer's "service" to the person from whom they obtain their goods. It is

(continued...)

## III.  Cross-Appeal

The FLSA requires eligible employees to be compensated at one and one-half their hourly wages for overtime hours worked.  29 U.S.C. § 207(a)(1).  Where, however, certain conditions are met, the rate is reduced to "half time."  29 C.F.R. § 778.114 (2003).  This is referred to as the "fluctuating workweek" method.  Pursuant to the Department of Labor's regulations, the fluctuating workweek method is to be used when "there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period."  *Id.* § 778.114(a).  Under this kind of compensation structure, the salary "is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek."  *Id.*  Thus, regardless of the fluctuating nature of the hours an employee may work, be it forty or sixty, the salary is intended to pay for all hours worked.  In contrast, an employee who is compensated on an hourly basis is entitled to overtime calculated by the time-and-a-half method.

[4](...continued)
obvious that the relationship here is the reverse of that of salesman-customer.

29 C.F.R. § 541.501(e) (2003).  In a loose sense, the Employees were selling the Army's services; they were promoting the idea of a military career.  The Army, however, appears to be the customer, paying for the services of the recruits who enlist.  The parties do not raise this argument and we decline to *sua sponte* decide the case on this ground.

By its own terms, § 778.114 applies only if there is "a clear mutual understanding of the parties" that the fixed salary is compensation for however many hours the employee may work in a particular week, rather than for a fixed number of hours per week. The district court found the parties had such an understanding, and therefore calculated back pay pursuant to the fluctuating workweek method. The Employees cross-appeal this ruling and ask this court to hold the Employees are entitled to back pay calculated pursuant to the time-and-a-half formula.

The Employees contend § 778.114 requires that the "clear mutual understanding" must extend to how overtime premiums would be calculated. The parties initially agreed that no overtime would be paid; thus, no agreement as to the payment of overtime ever existed. The regulation, however, "calls for no such enlarged understanding." *Valerio v. Putnam Assoc. Inc.*, 173 F.3d 35, 40 (1st Cir. 1999). "The parties must only have reached a 'clear mutual understanding' that while the employee's hours may vary, his or her base salary will not." *Id.*; *see also Bailey v. County of Georgetown*, 94 F.3d 152, 156-57 (4th Cir. 1996) (rejecting the proposition that "an employee must also understand the manner in which his or her overtime pay is calculated" as contrary to the regulation). Thus, our inquiry is whether the Employees and Serco had a clear and mutual understanding that they would be paid on a salary basis for all hours worked.

-14-

We agree with the district court that the parties had this clear and mutual understanding. The plaintiffs stated in deposition testimony that they were hired on a salaried basis and that they routinely worked more than forty hours a week. They were neither docked for working less than forty hours a week nor paid more when they worked more than forty hours a week. *See Mayhew v. Wells*, 125 F.3d 216, 218-19 (4th Cir. 1997) (explaining employee was salaried where he was neither docked for running personal errands nor paid more when he worked ten extra hours a week). In letters sent to the Department of Labor, the plaintiffs described salary, not hourly, wage agreements. This fully supports the conclusion that the employees were paid on a salaried basis for all hours worked and that they had a clear and mutual understanding of this arrangement.

The Employees point to two pieces of evidence to suggest such an understanding did not exist. First, Clements testified that Serco's manager, Steve Hixon, stated the Employees "would be paid a salary of $600.00 per week and that this would work out to $15.00 per hour." A close examination of this statement, however, reveals that Clements testified that his understanding was that the Employees' *effective* rate of pay was $15.00 an hour, not that the Employees would be paid by the hour. The Employees, in subsequent affidavits, expressed that they understood Hixon's statements to mean they would be compensated for forty hours of work a week. This testimony does not create a disputed material fact. The existence of a clear and mutual understanding "may

-15-

be based on the implied terms of one's employment agreement if it is clear from the employee's actions that he or she understood the payment plan in spite of after-the-fact verbal contentions otherwise." *Mayhew*, 125 F.3d at 219 (quotation omitted). Evidence was presented that the Employees understood they would not be docked when they worked fewer than forty hours and would not be paid more when they worked over forty hours. This is sufficient to establish the Employees understood they would receive a fixed salary. Second, the Employees cite their numerous inquiries to Serco management and to the Department of Labor about whether they should receive overtime. Although this evidence supports the conclusion that the Employees and Serco did not have a clear and mutual understanding as to overtime pay, it is irrelevant as to whether the Employees understood they were being paid on a salaried or hourly basis.

Based on the fluctuating workweek method, the district court awarded Clements $3,006.82 in back pay and Gerber $3,651.02. We affirm this award.

## IV. Conclusion

For the foregoing reasons, we **affirm** the district court.

*Clements v. Serco, Inc.*, Nos. 06-4316 & 07-4005

**McCONNELL**, J., concurring.


I agree with the majority that the plaintiffs here were not "outside salesmen" because they did not have the authority to complete the transaction of signing recruits up for the Army. The more fundamental reason the plaintiffs must prevail, however, is that the activity of recruiting employees is not "sales" within the meaning of the Fair Labor Standards Act. The governing regulations define the term "outside salesman" as an employee "engaged away from his employer's place, or places, of business" in "making sales" or "obtaining orders or contracts for services." 29 C.F.R. § 541.500. A recruiter does not sell goods or services or obtain orders or contracts for goods or services. Rather, the recruiter purchases (or in this case, engages in promotional activities leading to the purchase of) services from the recruit. A recruiter is more like a buyer than a seller.[1]

A Department of Labor Opinion Letter, cited by the plaintiffs (Appellees' Br. at 17), is closely on point. *See* Opinion Letter from Dept. of Labor, Wage and Hour Div. (Oct. 4, 1982), 1982 DOL WH LEXIS 28. The letter holds that recruiters cannot be "outside salespersons" because "[w]ork such as recruiting an

---

[1] A college recruiter is different. A college recruiter persuades prospective students to purchase the college's services; he is not attempting to persuade students to sell their services to the college. Thus, *Nielson v. DeVry, Inc.*, 302 F. Supp.2d 747, 750 (W.D. Mich. 2003), is inapposite.

employee for the client would not be considered part of the sales activity of the recruiter." *Id*. at *4. The Department of Labor regulations make clear that those who buy goods and services on behalf of their employers are not engaged in "sales," even though they "in a very loose sense are sometimes described as selling their employer's 'service' to the person from whom they obtain their goods. It is obvious that the relationship here is the reverse of that of salesman-customer." 29 C.F.R. § 541.501(e) (2003).

Presumably, the majority does not place primary reliance on this rationale, see Maj. Op. 12 n.4, because in their briefs in this Court the appellees focused on other legal arguments. I have no quarrel with that, but the opinion should not be misconstrued as implying that recruiters would be "salesmen" if they had the authority to finalize the enlistments. Even if the plaintiffs in this case had accompanied the recruits into the recruiting station and signed the final paperwork on behalf of the Army, this would not make them "salesmen." To be a salesmen, the employee's job must be to sell. Hiring, or recruiting for hire, is not sales.