# United States Court of Appeals
## For the First Circuit

No. 20-1747

JOSEPH MODESKI, et al.,

Plaintiffs, Appellants,

v.

SUMMIT RETAIL SOLUTIONS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, Chief U.S. District Judge]

Before

Lynch, Lipez, and Thompson,
Circuit Judges.

Benjamin L. Davis, III, with whom the Law Offices of Peter T. Nicholl was on brief, for appellants.
Barry J. Miller, with whom Michael E. Steinberg and Seyfarth Shaw LLP were on brief, for appellee.

February 25, 2022

**LIPEZ, <u>Circuit Judge</u>**.  The Fair Labor Standards Act ("FLSA") generally requires employers to pay minimum wage and overtime.  29 U.S.C. §§ 206(a), 207(a)(1).  However, it exempts from these protections anyone employed "in the capacity of outside salesman."  <u>Id.</u> § 213(a)(1).  The question here is whether the appellants in this case -- who worked as "Brand Representatives" for appellee, a marketing company -- fall within that outside sales exemption.  Agreeing with the district court that the appellants qualify as outside salespeople under governing law, we affirm the district court's summary judgment ruling in favor of the marketing company.

**I.**

**A. Facts**

The following facts are undisputed.  Summit Retail Solutions is a marketing company that contracts with clients -- department stores, grocery stores, and wholesale retailers -- to provide in-store demonstrations designed to increase sales.  Its clients include Costco, Sam's Club, and BJ's.

Summit employs "Brand Representatives" to perform these in-store demonstrations and engage with customers.  Brand Reps are assigned to designated stores, where they set up a display featuring a particular product (for example, bamboo pillows, frozen pierogi, or a garlic butter purported to make the "best grilled cheese sandwich ever").  Brand Reps then hand out samples

or otherwise demonstrate the product (e.g., by getting customers to "feel how soft the pillow" is). Summit provides Brand Reps with sales pitch scripts, promotional materials, and training in specific sales techniques. Brand Reps often have sales experience before joining Summit.

The Brand Reps' goal is to "convert" a sale by getting the customer to place the product in his or her cart or basket. Brand Reps do not finalize any sale at their display station. Rather, customers pay for all their items at cash registers near the front of the store. Summit adopted this approach because it is more efficient for the actual sales transactions to occur all at once, at the registers operated by the retail store's own employees. That is also how retail stores typically operate.

Because of these arrangements, Brand Reps cannot be sure that customers with whom they have spoken are ultimately purchasing the products. A shopper who takes a product from the display station might have second thoughts and decide to return the item to the display (or just leave it somewhere in the store). Conversely, a Brand Rep might not be personally responsible for every sale of a displayed item. For example, a customer might grab a box of pierogi from the freezer without engaging with the Brand Rep or take a pillow from the display station when the Brand Rep is away on lunch break. As a result, a Brand Rep would

generally not know the exact sales numbers until he or she checks the sales report the next day.

In addition to assigning Brand Reps to specific stores, Summit sets their schedules and dictates which products they display.  Once assigned to a store, Brand Reps set up and stock their own displays.  At the beginning of their workday, Brand Reps are required to submit time-stamped pictures of their displays to Summit, to confirm that they have arrived on time and that the displays are properly set up.  Brand Reps' hours are carefully recorded and tracked.

Summit pays its Brand Reps a base hourly wage ranging between $10 and $15 per hour.  Brand Reps can also earn commission-style bonuses (referred to internally as "true-up payments").[1]

## B. Procedural background

A group of former Brand Reps sued Summit on behalf of themselves and other Brand Reps, seeking to recover unpaid overtime wages under the FLSA and analogous state wage laws.  Their theory

---

[1] To calculate these payments, Summit compares the total hourly pay that a Brand Rep earns with a set percentage of the total product sales that were generated by the Rep at his or her store.  If the latter exceeds the former, the Brand Rep receives that excess as a bonus.  If, however, the former exceeds the latter, the Brand Rep accrues a negative balance, which would then be offset against any future bonuses.  A Brand Rep who maintains a significant negative balance for an extended period (i.e., several weeks) would be subject to disciplinary action, including termination.

was that the true-up system forced Brand Reps to systematically underreport their actual hours, lest they face termination or other adverse consequences for maintaining a negative balance between their hourly pay and the set percentage of product sales. As a result, they alleged, many Brand Reps failed to receive overtime wages for working over forty hours per week.

As part of its defense, Summit argued that plaintiffs fell within the FLSA's outside sales exemption and thus were not entitled to overtime compensation at all.[2] The parties cross-moved for summary judgment on that issue. The district court agreed with Summit and, in a comprehensive and thoughtful decision, granted summary judgment in Summit's favor and dismissed the case in its entirety. On appeal, plaintiffs argue that the district court erred in concluding that they were subject to the exemption.[3]

---

[2] In the past, Summit apparently had classified Brand Reps as "non-exempt" employees entitled to overtime and had paid overtime (at time-and-a-half) for all hours reported over forty per workweek. At some point before the present suit, Summit changed its position. Regarding this shift, the district court noted that "[s]everal courts have . . . held that 'while the label of "nonexempt" may be evidence that a position is not exempt, such a label is not dispositive.'" Modeski v. Summit Retail Sols., Inc., 470 F. Supp. 3d 93, 101 (D. Mass. 2020) (quoting Burke v. Alta Colls., Inc., No. 11-cv-02990-WYD-KLM, 2015 WL 1399675, at *44 (D. Colo. Mar. 23, 2015)). On appeal, plaintiffs assert that "[t]he fact that Summit classified its Brand Reps as non-exempt to begin with reveals the futility of its subsequent exemption argument." We disagree.

[3] Consistent with the parties' briefing, the district court determined that the analogous state law wage claims were subject

- 5 -

We review a grant of summary judgment de novo and affirm if the record, construed in the light most favorable to the nonmovant, presents no genuine issue of material fact and shows that the movant is entitled to judgment as a matter of law. See Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 20-21 (1st Cir. 2018). That both plaintiffs and defendant moved for summary judgment does not change the underlying standard; we simply determine whether either side deserves judgment as a matter of law on the undisputed facts. See Wells Real Est. Inv. Tr. II, Inc. v. Chardon/Hato Rey P'ship, S.E., 615 F.3d 45, 51 (1st Cir. 2010).

While the FLSA generally requires that employers pay their employees a statutory minimum wage and overtime, see 29 U.S.C. §§ 206(a), 207(a)(1), it exempts from those requirements "any employee employed . . . in the capacity of outside salesman." 29 U.S.C. § 213(a)(1). The FLSA itself does not define "in the capacity of outside salesman" or the component terms. Instead, it leaves them to be "defined and delimited . . . by regulations of the Secretary [of Labor]." Id.; see also Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 165 (2007) (noting that "the FLSA explicitly leaves gaps" to be filled by regulations).

---

to the same outside sales analysis as the FLSA claim. Plaintiffs have not challenged that conclusion on appeal.

The relevant federal regulations, in turn, define an "employee employed in the capacity of outside salesman" as any employee (1) "whose primary duty is . . . making sales within the meaning of [29 U.S.C. § 203(k)]" and (2) "who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500(a).[4] The cross-referenced statutory provision, 29 U.S.C. § 203(k), provides that "'[s]ale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."

Plaintiffs do not contest that they were "customarily and regularly engaged away from the employer's place or places of business." 29 C.F.R. § 541.500(a)(2). They also accept that their "primary duty" was communicating with potential customers and trying to convince them to buy the featured products (and not, for example, stocking shelves or setting up the displays). See id. § 541.500(a)(1)(i). But they reject the idea that those activities amount to "making sales." See id. They contend that as Brand Reps they did not "mak[e] sales" within the meaning of the FLSA because they "never sold anything" -- i.e., they did not obtain a

_____

[4] The definition also includes any employee "[w]hose primary duty is . . . obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer." 29 C.F.R. § 541.500(a)(1)(ii). That part of the definition is not at issue in this case.

sufficiently concrete purchase commitment from shoppers (who were always free to reconsider their decision to take a product from the display station and remove the item from their cart before heading to the register).

## III.

Our analysis begins with the Supreme Court's seminal consideration of the outside sales exemption in Christopher v. SmithKline Beecham Corp., 567 U.S. 142 (2012). In determining whether certain pharmaceutical sales representatives fell within the exemption, the Court in Christopher outlined several considerations that are germane to resolving the present dispute.

First, the FLSA provision establishing the exemption refers to anyone employed "in the capacity of [an] outside salesman." 29 U.S.C. § 213(a)(1) (emphasis added). Christopher suggested that "the statute's emphasis on the 'capacity' of the employee" is an "interpretative clue" that "counsels in favor of a functional, rather than a formal, inquiry, one that views an employee's responsibilities in the context of the particular industry in which the employee works." 567 U.S. at 161.

Second, as previously mentioned, the relevant statutory definition provides that "'[s]ale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k). Again, per Christopher: (1) the word "includes" suggests that the subsequent

- 8 -

examples are "illustrative, not exhaustive," 567 U.S. at 162, (2) the open-ended modifier "any" suggests a sale "indiscriminately of whatever kind" is sufficient to fall within the definition, id. (quoting United States v. Gonzales, 520 U.S. 1, 5 (1997)), and (3) the final phrase ("other disposition") functions as a "broad catchall," suggesting that Congress (and thus the Department of Labor ("DOL")) wanted to define sale in a "broad manner," did not intend to require a "'firm agreement' or 'firm commitment' to buy," and meant "to accommodate industry-by-industry variations in methods of selling commodities," id. at 163-64.

Third, Christopher noted that the DOL itself has explained (in reports and regulations) that the exemption is applicable "whenever an employee 'in some sense make[s] a sale.'" Id. at 149 (quoting U.S. Dep't of Labor, Wage & Hour Div., Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition 46 (1940)). The Department has also "made it clear that '[e]xempt status should not depend' on technicalities, such as 'whether it is the sales employee or the customer who types the order into a computer system and hits the return button.'" Id. (quoting Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,163 (Apr. 23, 2004)).

Christopher thus indicates that we should consider the plaintiffs' situation pragmatically, in the context of the relevant industry, not relying on technicalities, and without requiring them to have obtained a firm commitment to buy in order to determine that they "mak[e] sales" within the meaning of the FLSA. Taken together, these considerations support our conclusion that Brand Reps fall within the outside sales exemption.

Although they do not ring up any purchase at the register, Brand Reps do as much as practically possible to "in some sense make[] a sale" in the retail store context in which they operate. Id. at 149 (quoting U.S. Dep't of Labor, Wage & Hour Div., Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition 46). Brand Reps work to persuade shoppers, who then can demonstrate some intention (or "nonbinding commitment") to buy a product by placing it in their shopping carts or baskets. Id. at 149, 161. As the district court noted, "[t]he cashiers r[i]ng up the sale, but otherwise engage[] in no sales activity of any kind. There is no evidence that any cashier ever attempted to persuade a customer to buy the product, and indeed it would [be] odd for them to do so at the point of check-out." That is, a Brand Rep is the last person to make an actual sales effort; the finalization process -- at the checkout register when the cashier rings up the purchase -- is simply a nondiscretionary, ministerial act that does not involve any

additional sales effort.  See Gregory v. First Title of Am., Inc.,
555 F.3d 1300, 1310 (11th Cir. 2009) (finding plaintiff subject to
the outside sales exemption in part because there was "no
intervening sales effort between her efforts and the consummation
of the sale").  In short, the type of transaction at issue in this
case fits well within the broad "other disposition" catchall for
"making sales."  See Christopher, 567 U.S. at 163; 29 U.S.C. §
203(k).[5]

Our conclusion, which is grounded on Christopher, the
text of the statute, and the DOL regulations, draws further support
from a recent DOL opinion letter.  This opinion letter considered
the status of employees like plaintiffs who "travel to various
retail operations such as . . . so-called big-box stores," "set up
displays in which they exhibit and demonstrate products they are
selling," and "spend most of their time pitching products to
potential customers at the various retail locations."  U.S. Dep't
of Labor, Wage & Hour Div., Opinion Letter FLSA2020-8 (June 25,
2020), at 1.  Although the DOL could not conclusively determine
whether the specific employees at issue were engaged in sales, the
letter identified the relevant inquiry as whether "the employees
are obtaining commitments from customers and being credited for

_____

[5] We disagree with our dissenting colleague that this
conclusion conflicts with the FLSA's goal of protecting covered
workers.  Rather, our conclusion clarifies which workers are
covered by the relevant statutory protections.

the sales consummated because of their efforts." Id. at 4.[6] In this case, Brand Reps did obtain a commitment from customers (albeit a nonbinding one) and generally were credited with sales made as a result of their efforts.[7]

**IV.**

Appellants offer several arguments against their inclusion within the outside sales exemption. Most importantly, they suggest that we should not be guided by Christopher because of a key factual difference between that case and ours. The pharmaceutical sales representatives in Christopher were

---

[6] The opinion letter was issued in response to a "request for an opinion on whether salespeople who set up displays and perform demonstrations at various retail locations not owned, operated, or controlled by their employer to sell the employer's products qualify for the outside sales exemption." Opinion Letter FLSA2020-8, at 1. The factual situation presented in the request differs in some ways from the situation in this case -- for example, the employees referenced in the request spend some portion of their time working from home. Id. The DOL ultimately could not determine whether these employees working at "big-box stores" fell within the outside sales exemption because (1) the requestor's "description of the employees' activities does not describe whether or how an employee obtains a commitment from the customer to buy" and (2) "it is unclear if the employees are given credit for the sales that were consummated specifically through their efforts." Id. at 4.

[7] We say that Brand Reps "generally" were credited with sales made as a result of their efforts because there is some imprecision in the system. For example, as previously noted, a customer may return a product it took from the Brand Rep's display station to the shelf or take a product from the station while it is unattended.

prohibited by law from consummating any sales because prescription drugs, under federal law, can be dispensed only with a doctor's prescription.  Christopher, 567 U.S. at 150.  The sales reps instead promoted their companies' products (prescription drugs) to doctors but did not actually sell anything -- at most, the sales reps would obtain "a nonbinding commitment from the physician to prescribe [the company's] products in appropriate cases."  Id. at 151.  The legal limitation on the reps' ability to consummate sales influenced the Court's analysis:

> Obtaining a nonbinding commitment from a physician to prescribe one of respondent's drugs is the most that petitioners were able to do to ensure the eventual disposition of the products that respondent sells.  This kind of arrangement, in the unique regulatory environment within which pharmaceutical companies must operate, comfortably falls within the catchall category of "other disposition."

Id. at 165 (footnote omitted).  In an accompanying footnote, the Court further clarified its point: "[W]hen an entire industry is constrained by law or regulation from selling its products in the ordinary manner, an employee who functions in all relevant respects as an outside salesman should not be excluded from that category based on technicalities."  Id. at 165 n.23.

Of course, Summit's Brand Reps were not prohibited by law from finalizing the sales at their display stations.  Instead, they were constrained by Summit's choice, based on the

practicalities involved in the retail store context, to have all products rung up at the store registers. But as the Second Circuit has explained, "[a]lthough Christopher noted that the regulatory context barred an employee from selling the company's drugs directly to a consumer without a doctor's prescription, . . . Christopher does not further suggest that its reasoning and interpretation of the statute and regulations" -- what we have identified as its pragmatic approach, not relying on technicalities -- "lack[s] general applicability to other cases arising under the FLSA." Flood v. Just Energy Mktg. Corp., 904 F.3d 219, 230-31 (2d Cir. 2018). We agree that Christopher's overall construction of the FLSA and the attendant regulations are not limited to that case's particular facts. See 567 U.S. at 161-64.[8]

Plaintiffs argue that out-of-circuit case law supports their position. They rely particularly on Hurt v. Commerce Energy, Inc., 973 F.3d 509 (6th Cir. 2020). The plaintiffs there worked as door-to-door solicitors, trying to convince customers to purchase electricity and natural gas products from their company, Just Energy. Id. at 514. If interested, customers would sign

---

[8] Our dissenting colleague suggests that the scope of the outside sales exemption depends on the extent to which the relevant industry is regulated. But if Congress or the Supreme Court intended to limit application of the exemption to heavily regulated industries, they could have said as much. They did not do so.

something called a "customer agreement," but that agreement "was non-binding and did not finalize the transaction." Id. Just Energy had complete authority to accept or reject the agreement. Id. In practice, it would regularly reject agreements -- sometimes due to a failed credit check, but often seemingly for purely discretionary reasons, which were often not even communicated to the solicitors. Id. at 514-15, 519. On these facts, the court concluded that the solicitors were not "making sales." Id. at 521.

In reaching that conclusion, as the plaintiffs here stress, the Hurt court found it significant that "[n]o regulatory environment prohibited the solicitors from controlling and completing the sale directly to customers." Id. at 519. To the Hurt court, that fact meaningfully distinguished the case from Christopher and in part led to the conclusion that the solicitors were not making sales. Id. But as we have indicated, we do not think that the underlying logic of Christopher can be properly limited to situations where an employee cannot consummate a sale because of the regulatory context.

In any case, Hurt also seemed to rely on the fact that, regardless of whether the arrangement was determined by law or the choice of a business model, any customer agreement was subject to verification and approval by Just Energy and customer agreements were frequently rejected. Id. at 519. That is, Just Energy

- 15 -

retained ultimate discretion to finalize the sale. Id. Here, by contrast, although customers can choose not to purchase a product after interacting with a Brand Rep, no entity at the store other than the Brand Rep has any discretionary role in determining whether the sale is consummated.

For additional support of their position, plaintiffs point to Beauford v. ActionLink, LLC, 781 F.3d 396 (8th Cir. 2015), in which the court determined that so-called "brand advocates" were not subject to the outside sales exemption. Id. at 405. But the Beauford plaintiffs were hired merely "to visit retail stores, to train the retail stores' employees on how [the brand's] electronics worked, and to convince those employees to recommend [the brand's] products to customers." Id. at 399. The brand advocates occasionally answered questions for customers, but their job duties did not entail engaging customers for the purpose of persuading them to buy a particular product. Id. In other words, unlike in this case, "[b]rand advocates simply promoted products so employees of retail stores could make sales." Id. at 403.

Plaintiffs also suggest that, rather than "making sales," they were engaged in non-exempt "promotional work." They point to DOL regulations recognizing that potential distinction: as an example of promotional work, the regulations cite a hypothetical "company representative who visits chain stores, arranges the merchandise on shelves, replenishes stock by

replacing old with new merchandise, sets up displays and consults with the store manager when inventory runs low, but does not obtain a commitment for additional purchases." 29 C.F.R. § 541.503(c). In that scenario, "[t]he arrangement of merchandise on the shelves or the replenishing of stock" could be exempt if it were "incidental to and in conjunction with the employee's own outside sales." Id. But it would not be "exempt outside sales work" if the employee "does not consummate the sale nor direct efforts toward the consummation of a sale." Id.

We find these regulations to be of limited help to plaintiffs. Christopher rejected the idea that these particular regulations shed any light on the underlying inquiry here -- what qualifies as "making a sale." See 567 U.S. at 164 (noting that "the promotion-work regulation distinguishes between promotion work that is incidental to an employee's own sales and work that is incidental to sales made by someone else," but arguing that "this distinction tells us nothing about the meaning of 'sale'"). More fundamentally, plaintiffs are not helped by the promotion regulations because the promotion-type work that they do (e.g., setting up displays) is so clearly incidental to their own sales efforts. Further, they are not engaging in any type of work so that someone else can obtain a purchase commitment and consummate the sale.

Plaintiffs also contend that they do not exhibit the "external indicia" of salespeople. In Christopher, the Supreme Court found "further support" for its conclusion that the pharmaceutical reps fell within the outside sales exemption in the fact that the reps bore "all of the external indicia of salesmen." 567 U.S. at 165. Specifically, the Court noted that the pharmaceutical reps (1) "were hired for their sales experience," (2) "were trained to close each sales call by obtaining the maximum commitment possible," (3) "worked away from the office, with minimal supervision," and (4) "were rewarded for their efforts with incentive compensation."[9] Id. at 165–66.

These "external indicia" are not helpful to plaintiffs, even if the indicia do not precisely fit the Brand Rep position. Many of the Brand Reps had prior sales experience, even if they were not always specifically hired because of that experience. They received sales training from Summit and were paid commissions based on purchases made at their assigned stores (even if the true-up payments were not necessarily easy to qualify for). And while

---

[9] As other courts have noted, it is somewhat unclear how these "external indicia" relate to the Court's core outside sales analysis, which was focused on the meaning of "making sales." See Flood, 904 F.3d at 233-34 (noting that "the regulations that define 'making sales' do not include any reference" to many of the indicia); Vasto v. Credico (USA) LLC, 767 F. App'x 54, 57 (2d Cir. 2019) (unpublished summary order) (describing the indicia as "arguably dicta in Christopher"). Regardless, because the Supreme Court saw fit to mention these indicia, they warrant consideration in our analysis.

Brand Reps had to report their hours and provide pictures of their display stations, they were not closely supervised on a day-to-day or hour-to-hour basis.

Lastly, plaintiffs point to a statement in Christopher that the Court's holding "also comports with the apparent purpose of the FLSA's exemption for outside salesmen," because the pharmaceutical sales reps there were well-paid (earning more than $70,000 annually) and their work hours were hard to standardize. Id. at 166.  Courts have opined that the outside sales exemption "is premised on the belief that exempt employees 'typically earn[] salaries well above the minimum wage' and enjoy[] other benefits that 'se[t] them apart from the nonexempt workers entitled to overtime pay.'"  Hurt, 973 F.3d at 522 (quoting Christopher, 567 U.S. at 166).

It is true that, unlike the pharmaceutical reps in Christopher, Brand Reps are not paid well above the minimum wage, their retail-based hours would seem easy to standardize, and they are not the beneficiaries of job-related perks.  But we think it would be a mistake to rely on Christopher's "apparent purpose" comment rather than the Supreme Court's reasoning regarding the dispositive "making sales" issue.  Cf. Flood, 904 F.3d at 233 (noting that other aspects of the analysis in Christopher are "secondary to the Supreme Court's primary analysis of whether the 'making sales' requirement was satisfied in the first place").

- 19 -

Plaintiffs' arguments that they do not fall within the outside sales exemption are thus ultimately unavailing.[10]

**V.**

In summary, our analysis of the FLSA, guided by Christopher, leads us to the firm conclusion that plaintiffs do "mak[e] sales" within the meaning of 29 C.F.R. § 541.500(a)(1)(i), and thus fall within the outside sales exemption, 29 U.S.C. § 213(a)(1). We therefore affirm the judgment of the district court in Summit's favor.

So ordered.

**-Dissenting Opinion Follows-**

---

[10] We are troubled by plaintiffs' serious allegations that Summit systematically encouraged Brand Reps to underreport their hours as a way of evading wage laws. But these allegations -- which Summit denies -- are only marginally related to our analysis of the outside sales exemption under the FLSA. When pressed on the connection between the two claims at oral argument, counsel for appellants suggested that the allegations about underreporting go to the issue of whether Brand Reps bear the "external indicia" of salespeople if they do not control their hours and overall compensation. As we have explained above, even if Brand Reps do not precisely bear all the "external indicia" of salespeople, the mixed picture provided by the "external indicia" analysis does not outweigh our core conclusion that Brand Reps "make sales" within the meaning of the outside sales exemption. Whether the underreporting allegations could support claims under state wage-and-hour or contract law is not a question before us in this appeal.

**THOMPSON, <u>Circuit Judge</u>, dissenting.** The Supreme Court has recognized that Congress enacted the Fair Labor Standards Act ("FLSA") "with the goal of protect[ing] all covered workers from substandard wages and oppressive working hours." <u>Christopher</u> v. <u>SmithKline Beecham Corp.</u>, 567 U.S. 142, 147 (2012) (internal quotation omitted). This fundamental purpose animates why I would chart a different analytical path from my colleagues and would reverse the district court's ruling, instead finding that Brand Reps are non-exempt hourly employees entitled to overtime pay not subject to the Outside Sales Exemption ("OSE").[11]

In reaching their conclusion, my colleagues, in my opinion, over-rely on <u>Christopher</u> without taking into account the ways in which its holding is tethered to the facts of the case that was before the Court (facts very different than those presented here). There, the Court found that pharmaceutical sales representatives whose primary duty was to obtain nonbinding commitments from physicians to prescribe their employers' prescription drugs qualified as "outside salesmen." 567 U.S. at 165. But as I read it, <u>Christopher</u>'s holding was wrapped up in what constitutes a sale in the pharmaceutical industry, subject to

---

[11] Prior to this suit, Summit did in fact classify Brand Reps as non-exempt employees entitled to overtime. The OSE classification was only raised as part of Summit's defense in this suit.

extensive federal regulation, an issue not present here.  Id. at 150, 154.

To back up slightly, it's important to be clear on who an outside salesperson is, and what constitutes a "sale".  An outside salesperson is defined by regulation as an employee:

> (1) Whose primary duty is:
>         (i) making sales within the meaning of section 3(k) of the Act, or
>         (ii) obtaining orders or contracts for services or for the use of facilities for which consideration will be paid by the client or customer; and
>         (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a).

In Christopher, the Court, paraphrasing the FLSA and DOL regulations, offered the following definition: "an outside salesman is any employee whose primary duty is making any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."  567 U.S. at 148.  The definition of "sale" is broad, and the list of transactions defining a "sale" in the regulations represents "an attempt to accommodate industry-by-industry variations in methods of selling commodities."  Id. at 163-64.  The pharmaceutical sales reps at issue in Christopher were exempt under the OSE because of the DOL's "other disposition" phrase in the sales regulations.  Id. at 165.  Because of the highly regulated nature of the pharmaceutical industry, the Court

found that the non-binding commitments made by sales reps were the closest commitment to a sale in that particular industry.  Id. at 161.  Determining whether an employee's work should be considered "other disposition" sales requires a functional inquiry as to what a sale would be in the particular industry.  Id.  Indeed, in rejecting the dissent's suggestion "that any employee who does the most that he or she is able to do in a particular position to ensure the eventual sale of a product should qualify as an exempt outside salesman," the majority in Christopher made clear, "our point is that, when an entire industry is constrained by law or regulation from selling its products in the ordinary manner, an employee who functions in all relevant respects as an outside salesman should not be excluded from that category based on technicalities."  Id. at 165 n.23 (citing id. at 177 (Breyer, J., dissenting)).

In this appeal, we are not scrutinizing a technicality, and the majority's attempt to place Brand Reps in the shoes of pharmaceutical reps for the purposes of the "making sales" analysis is like trying to fit a square peg into a round hole.  Here, unlike in Christopher, there is nothing highly regulated or unique about the retail industry that prevents Brand Reps from making sales. In contrast to the pharmaceutical industry, Summit determines how far Brand Reps can go in their sales efforts.  So when the majority says that "a Brand Rep is the last person to make an actual sales

effort", it isn't because that is what the industry dictates (like in <u>Christopher</u>), but rather it is Summit's preferred business model that prevents Brand Reps from completing sales. Indeed, the fact that there is "no intervening sales effort" tells us nothing about whether Brand Reps make sales, because in this context, it's difficult to even tie the sales to the "effort" in a concrete way. The commissions received by Brand Reps were not necessarily tethered to their individual performance, because a customer could pick up an item from their display without a Brand Rep knowing, (for instance, someone could pick up one of the products they were promoting while the Brand Rep was on a break, thereby purchasing the product without any "sales" effort on the part of anyone), just as a customer could seem to want a product at a display and later discard it elsewhere in the store before checkout. While <u>Christopher</u> can provide us insight into how to evaluate when a "sale" is made, our judicial superiors analyzed the FLSA's OSE paradigm as it related to the facts in front of it -- facts quite different from what we analyze today. The majority's lock-step loyalty to <u>Christopher</u> ignores this limitation, and because of that, I depart from them.

Our sister circuits, who've ably navigated this issue in a way I find more persuasive, focus on the importance of obtaining binding commitments as a cornerstone in determining who makes

sales.[12]  In Hurt v. Commerce Energy, Inc., plaintiffs went door-to-door seeking to convince customers to buy natural gas products for the defendants.  973 F.3d 509, 514 (6th Cir. 2020), cert. denied sub nom. Just Energy Mktg. Corp. v. Hurt, 141 S. Ct. 2720 (2021).  Once a customer became interested, there was a third-party verification process, where the sale was not final until a verification call happened.  Id.  The actual door-to-door sales reps could not finalize or verify any sales.  Id.

Here, the Sixth Circuit noted that Christopher is of limited import because of the "unique regulatory environment of the pharmaceutical industry."  Id. at 519.  Rather, in considering the work performed by the Hurt plaintiffs, the court found that "mere soliciting or inducing applications is not making sales," id., because "the touchstone for making a sale is . . . obtaining a commitment," id. (alteration in original) (quoting Clements v. Serco, Inc., 530 F.3d 1224, 1227 (10th Cir. 2008)).  Because the plaintiffs "could only lay the groundwork," but not complete the sale, the Sixth Circuit concluded that due to defendants' business model, plaintiffs were not subject to the OSE.  Id. at 520 (quoting Clements, 530 F.3d at 1229).

---

[12] While precedents from our sister circuits are not binding on us, where well-reasoned decisions from our far away colleagues can aid in analyzing the cases before us, it would be silly to ignore them.  See United States v. Tavares, 705 F.3d 4, 20 (1st Cir. 2013) (employing the approach of looking to sister circuits).

The path taken in Hurt, which emphasizes the importance of obtaining a commitment to be considered a sale, is the best approach flowing from Christopher's reasoning when analyzing the fate of Brand Reps as outside salespeople or not.  The job of Brand Reps is to communicate with customers and try to convince them to buy Summit's client's products.  Just as in Hurt, after the Brand Rep's interaction with a customer, they have no way of knowing if they would be credited for the sale until much after, when the sales numbers from the retailer came in.  Id. at 514-15.

My colleagues write off Hurt because "although customers can choose not to purchase a product after interacting with a Brand Rep, no entity at the store other than the Brand Reps has any discretionary role in determining whether the sale is consummated."  In essence, they are saying, "if Brand Reps aren't making the sales, then who is?"  It is this fundamental flaw that weighs in favor -- not against -- seeing Brand Reps as exempt from the OSE, and why context matters when interpreting "making sales" in different industry environments.  It is Summit's choice that Brand Reps don't make sales -- in fact, Summit's own website states their mission as "grow[ing] brands [and] produc[ing] results".  In other words, Brand Reps are better viewed as pitch men, not product sellers or retailers.[13]

---

[13] Summit's website also states that with respect to retailers, Summit offers the following: "[o]ur in-store

Another sister circuit has addressed this issue in a similar factual context. See Beauford v. ActionLink, LLC, 781 F.3d 396 (8th Cir. 2015). There, "brand advocates" employed by a marketing services provider, who did not make direct sales (but rather engaged in promotional activities to boost sales for an electronics manufacturer), were not considered outside salesmen exempt from the FLSA's overtime requirements. Id. at 403. The job duties of brand advocates, as described by the Eighth Circuit, were quite similar to that of Brand Reps here:

> ActionLink hired "brand advocates" to visit retail stores, to train the retail stores' employees on how LG electronics worked, and to convince those employees to recommend LG products to customers. ActionLink preferred to hire brand advocates with prior sales and marketing experience, but it did not require this prior experience. Brand advocates occupied the bottom of ActionLink's organizational chart.
>
> ActionLink typically trained brand advocates for five days. It assigned every brand advocate approximately twenty stores to cover each week. ActionLink provided brand advocates with scripts, PowerPoint presentations, and other promotional materials to use when they visited stores. In addition to teaching store employees about LG products, the brand advocates maintained in-store LG displays, cleaned and repaired LG products, and spoke with customers who had questions about the products. The brand advocates' goal was to boost sales of LG products. ActionLink provided each brand advocate a small monthly budget to use for promotional activities. Despite their other tasks, brand advocates did not sell directly to customers or to retail stores. ActionLink

demonstrations and carefully planned customer interactions create an authentic brand interaction with your customers and drive sales." To "drive" a sale is far different than consummating, or making, a sale, which is why I see Brand Reps as promotional workers. More on that later.

prohibited brand advocates from negotiating prices, making marketing decisions, and deciding what inventory should be ordered. Brand advocates maintained a close relationship with their supervisors. They frequently spoke with supervisors during conference calls and through emails. And at the end of each store visit, ActionLink required brand advocates to complete a six-page call report informing ActionLink exactly what the brand advocates did during their visits.

Id. at 399-400.

As this lengthy description lays bare, the majority appears to cherry-pick parts of these brand advocates' job duties that minimize their efforts and distinguish them from Brand Reps. However, some of the key duties that the majority fails to mention are the most similar to Brand Reps here, such as "sp[eaking] with customers who had questions about the products" and "boost[ing] sales of LG products." Id. at 399. Nothing in the job descriptions of the Brand Reps here or the brand advocates in Beauford suggests these employees were outside salesmen as contemplated by 29 C.F.R. § 541.500(a).

The Eighth Circuit also pointed out the importance of industry differences, reasoning that

[u]nlike the pharmaceutical industry discussed in Christopher, the world of consumer electronics is not subject to a "unique regulatory environment" that requires a recommendation from a licensed professional to obtain a product. Although a recommendation from a sales person may help a customer decide to purchase a specific brand of electronics, a customer need not obtain a recommendation before purchasing a product, and the customer is not constrained to purchase only recommended products. [So,] [t]he same danger that accompanies pharmaceutical

drugs is not present in the electronics context . . . . Those retail-store employees engaged in the paradigmatic sale of electronics—they convinced customers to choose a product and helped that customer pay for it at the cash register.

Id. at 403.

The same is true here.  Brand Reps can only go so far as to promote a product, and never know (until the sales numbers come in) whether or not a sale is actually consummated at the register by the retail store employees, and whether their promotion (if one even took place) had anything to do with it.[14]

Satisfied that Brand Reps' activities do not constitute making "sales" under the FLSA, I find that non-exempt promotional work more accurately fits the bill when describing their job duties.  In this regard, the majority advises that the regulations surrounding promotion are of "limited help" because the regulations do not "shed any light on the underlying inquiry" into what "make[s] a sale".  Since I've already concluded that no sales were made, I find the promotional regulations useful as I will explain.  As the regulation makes clear, promotion work can be

---

[14] District courts have also come to similar conclusions. See Gorey v. Manheim Servs. Corp., 788 F. Supp. 2d 200, 206-07 (S.D.N.Y. 2011) (employees of an automobile auction operator, who were tasked with inducing dealers to bring cars to auction lots and earned commissions when the cars were sold were not engaged in outside sales); Campanelli v. Hershey Co., 765 F. Supp. 2d 1185, 1190-91 (N.D. Cal. 2011) (declining to consider retail sales representatives (RSRs)as outside salesmen, where RSRs directly sold products to some retailers, there was no evidence that it was the primary duty of any RSR to make direct sales).

performed by persons who make sales, "which may or may not be exempt outside sales work, depending upon the circumstances under which it is performed." 29 C.F.R. § 541.503(a). Having already spelled out why I do not find Brand Reps to have engaged in exempt work, the regulation provides additional insight into how to categorize Brand Reps' duties. Brand Reps engage in "[p]romotional activities designed to stimulate sales that will be made by someone [other than the brand advocate]." Id. § 541.503(b). And the DOL's example of non-exempt promotional work describes Brand Reps' work better than I could: "a company representative who visits chain stores, arranges the merchandise on shelves, . . . [and] sets up displays . . . but does not obtain a commitment for additional purchases" is performing non-exempt work. Id. § 541.503(c).

What's more -- Brand Reps do not retain the "external indicia," Christopher, 567 U.S. at 165, of salesmen, a consideration the Court made along with determining if an employee's position "comports with the apparent purpose of the . . . exemption[,]" Hurt, 973 F.3d at 522 (quoting Christopher, 567 U.S. at 166.) In Christopher, the Court considered the fact that "[p]etitioners were hired for their sales experience[,]" had "minimal supervision" and "were rewarded for their efforts with incentive compensation" as factors supporting the external indicia of salespeople. Christopher, 567 U.S. 142 at 165-66. In Hurt, the Sixth Circuit notes that where, as here,

employees were "closely supervised" and "supervisors controlled Plaintiff's daily schedules, including selecting the streets on which they were to work[,]" employees' external indicia weighs against considering them outside salespeople. Hurt, 973 F.3d at 522. Here, Brand Reps look much more like the Hurt employees than the Christopher employees, and I'll explain why.

As discussed above, Brand Reps cannot obtain commitments from customers, which is one of the most important responsibilities of a salesperson. In addition, a typical salesperson has motivation to work, because typically, the more sales they make, the more money they take home, i.e., they are "rewarded for their efforts". Christopher, 567 U.S. at 166. But here, that dynamic isn't at play. Brand Reps have minimal independence, independence being one of the hallmarks of a salesperson. Brand Reps don't have control over their schedules or work assignments; they are given a schedule by a manager, and they clock their hours every day. Summit also has control over where they are assigned, and the hours could vary based on the retailer they are assigned to visit. The Brand Rep doesn't choose their store assignment -- their manager does. Brand Reps are expected to send their managers pictures of their store display so the manager would know they are doing their job correctly. Not to mention that their salaries, unlike the pharmaceutical sales representatives in Christopher who "earned an average of more than $70,000 per year," are not much

above minimum wage. <u>Christopher</u>, 567 U.S. at 166 ("The exemption is premised on the belief that exempt employees typically earned salaries well above the minimum wage and enjoyed other benefits that se[t] them apart from the nonexempt workers entitled to overtime pay."(internal quotations omitted)). These factors, when viewed together using a functional, industry-wide analysis, weigh in favor of a finding that Brand Reps are not outside salesmen.

Taking together the analytical paths travelled by sister circuits and mindful of the instructive considerations and factors those cases lay out, on the facts of this case, I'm compelled to reach the opposite conclusion from my colleagues in the majority. Ever mindful of the legislative goal of the FLSA -- to protect employees from unfair employment practices -- I'll end where I began: with an outcome weighing in favor of employee pay, compelling a reversal of the district court's ruling and finding that Brand Reps are non-exempt hourly employees entitled to overtime pay.